UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| Priorities USA, Rise, Inc., and the Detroit/Downriver Chapter of the A. Philip Randolph Institute,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>Dana Nessel, in her official capacity as Attorney General of the State of Michigan,<br><br>　　　　Defendant. | NO. 2:20-cv-10211<br><br>JUDGE<br><br>MAGISTRATE<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF (42 U.S.C. § 1983)** |

Plaintiffs, complaining of Defendant Dana Nessel, in her official capacity as Michigan Attorney General, say and allege:

## INTRODUCTION

1.　"[E]ach and every citizen has an inalienable right to full and effective participation in the political processes," *Reynolds v. Sims*, 377 U.S. 533, 565 (1964), and the choice whether to exercise the right to vote is central to the vindication of that right. *See League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 724 (M.D. Tenn. 2019) ("Registering to vote is not a politically neutral act, and neither is declining to."). As Justice Powell eloquently noted, "the citizen who distributes his party's literature, who helps to register voters, or who transports voters to the polls on Election Day performs a valuable public service" that supports our democratic

process. *Branti v. Finkel*, 445 U.S. 507, 529 n. 10 (1980) (Powell, J., dissenting). Efforts to encourage citizens to exercise political power not only support the democratic process, but also represent an outward manifestation of political expression, which are protected by the First and Fourteenth Amendments to the U.S. Constitution. *See Buckley v. Am. Const'l Law Found.*, 525 U.S. 182, 193 (1999); *Meyer v. Grant*, 486 U.S. 414, 421 (1988); *Hargett*, 400 F. Supp. 3d at 720; *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1158 (N. D. Fla. 2012); *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 700 (N.D. Ohio 2006); *Hernandez v. Woodard*, 714 F. Supp. 963, 973 (N.D. Ill. 1989).

2.     A supermajority of Michigan voters expressed an unequivocal desire to expand access to voting for all Michigan citizens with passage of Proposal 3 in 2018. Proposal 3 enshrined in the Michigan Constitution eight enumerated voting rights all aimed at expanding access to the ballot and making it easier to vote. Included in these new rights are expanded no-excuse absentee and early voting and the right to register to vote any day, inclusive of Election Day. But these rights can be fully effectuated only if Michigan citizens have the ability to freely associate and organize throughout all phases of the voting lifecycle—that is, communicating about candidates and issues, conducting voter registration drives, and ensuring that all eligible voters have an opportunity to make it to vote.

3.      Some Michigan citizens will be left out of this new, expanded access to the franchise because Michigan law bans certain efforts to encourage and assist voters to vote. Michigan law makes it a misdemeanor to "hire a motor vehicle" to transport voters to the polls unless those voters are "physically unable to walk." Mich. Comp. Law. § 168.931(1)(f) (the "Voter Transportation Ban"). Michigan law also criminalizes organizing efforts to encourage voters to submit applications for absentee ballots. Mich. Comp. Law § 168.759(4), (5), (8) (the "Absentee Ballot Organizing Ban").

4.      Together and independently, the Voter Transportation Ban and the Absentee Ballot Organizing Ban make voting even more difficult for people for whom voting is already difficult—in particular, those without access to private transportation. This includes young voters, senior voters, voters who are disabled, and low-income voters, all of whom lack access to private transportation at greater rates and traditionally use absentee voting. The Voter Transportation Ban and the Absentee Ballot Organizing Ban each represent unreasonable and unnecessary obstacles to voting that violate the First and Fourteenth Amendments and the clearly expressed wishes of a supermajority of the state.

5.      Michigan's Absentee Ballot Organizing Ban and Voter Transportation Ban impose substantial burdens on core political expression and activity.  The first purports to restrict who can communicate with and assist Michigan voters from

registering for an absentee ballot. The second purports to restrict anyone from paying for the transportation of voters to the polls. Both challenged provisions stand in the way of efforts to mobilize voters to participate in the electoral process and thereby increase their political power, particularly voters who have historically been underrepresented at the polls because they face difficulties getting to the polls on election day. The provisions therefore curb the efforts of progressive organizations like Plaintiff Priorities USA, who wish to encourage voters to support a progressive agenda, and of organizations like Rise and DAPRI who seek to increase the engagement of college students in the electoral process.

6.      There are only 43 days until the Michigan primary election and only 281 days until the 2020 general election, which will include highly competitive races for federal offices. Because each election is a unique, non-repeatable occurrence, no amount of monetary damages can make Plaintiffs whole if the Absentee Ballot Organizing Ban and Voter Transportation Ban remain in place for the upcoming primary and general elections. "[O]nce the election occurs, there can be no do-over and no redress." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). And each day lost is an opportunity lost to fundraise, recruit, and organize around activities specifically regulated by the bans—absentee ballot organizing and getting voters to the polls.

## PARTIES

7.     Plaintiff Priorities USA is a 501(c)(4) nonprofit, voter-centric progressive advocacy and service organization. Priorities USA's mission is to build a permanent infrastructure to engage Americans by persuading and mobilizing citizens around issues and elections that affect their lives. In furtherance of this purpose, Priorities USA works to help educate, mobilize, and turn out voters across the country, including in Michigan. Priorities USA has made and will continue to make contributions and expenditures in the millions of dollars to educate, mobilize, and turn out voters in the upcoming state and federal elections around the country. In particular, Priorities USA has committed to spending $100 million on voter engagement efforts in Michigan, Florida, Wisconsin, and Pennsylvania in anticipation of the 2020 election. In anticipation of the upcoming Michigan state and federal elections, Priorities USA has already spent over $1,000,000 on advertising and voter education. As part of its focus on educating and mobilizing voters in Michigan, Priorities USA launched Priorities Michigan, a project aimed specifically at educating and mobilizing voters and activists in Michigan. A significant focus of Priorities USA's work in Michigan is digital advertising. Priorities USA also employs organizers on the ground in Michigan. These organizers work with local activists and organizations on projects designed to engage activists and voters in the political process.

8.     Plaintiff Rise, Inc. is a student-led 501(c)(4) nonprofit organization that runs statewide advocacy and voter mobilization programs in Michigan and California, as well as on a number of campuses nationwide. Students are integral to setting Rise's agenda including its spending priorities. Rise's mission is to fight for free public higher education and an end to homelessness, housing insecurity, and food insecurity among college students. Efforts to empower and mobilize students as participants in the political process including as student organizers and as voters are critical to Rise's mission because building political power within the student population is a necessary condition to achieving its policy goals.

9.     To meet its goal of expanding students' access to the franchise in Michigan, Rise operates volunteer networks across the state at twelve university and community college campuses. In January 2019, Rise launched its second state specific campaign in Michigan. Rise has eleven student organizers in Michigan who are paid to organize their campuses. Part of the student organizers' work is communicating to their fellow students the importance of exercising political power by participating in the electoral process through voting and organizing. This effort has included and will continue to include engaging their fellow students in grassroots voter education, registration, and turnout activities, including on-campus get-out-the-vote drives and canvasses. Rise plans to continue this program through the 2020 election and beyond.

10.     Rise also partners with student groups and student governments, providing them with the necessary resources to execute ideas they have developed to mobilize their fellow students' participation in the political process, both in lobbying policymakers and voting. Additionally, Rise operates a grant-making program called "Run With It." Rise offers $1,500 grants to college students that have innovative plans to get their fellow students to vote.

11.     In 2018, Rise partnered with the student government at UC Berkeley to mobilize the student vote. In addition to a small grant, Rise provided relational organizing technology and assistance that enabled the student government to register 2,000+ voters on campus. As part of that effort, UC Berkeley students led a "Party at the Polls" where students could drop off their mail-in absentee ballots and celebrate with one another.

12.     In 2018, Rise worked with the #VoteTogether coalition organized by Civic Nation to help organize at least four on-campus election day parties for students in California. The goal of the parties was to promote awareness and interest in voting on campus. As part of those parties, party attendees were offered free or discounted rides to the polls by Uber. The offering was a crucial value proposition for participating in the parties.

13.     Rise intends to continue these efforts moving forward for the 2020 primary and general election. Rise has already awarded a $1,500 Run With It grant

to Tova Carters, a student at Michigan State University, to educate students about their ability to vote by mail.

14. Plaintiff the Detroit/Downriver Chapter of the A. Philip Randolph Institute Detroit/Downriver Chapter ("DAPRI") is the local chapter of the national 501(c)(3) nonprofit organization the A. Philip Randolph Institute. The A. Philip Randolph Institute, founded in 1965 by A. Philip Randolph and Bayard Rustin, is the senior constituency group of the AFL-CIO. DAPRI, a domestic nonprofit corporation, is a membership organization with the mission to continue to fight for Human Equality and Economic Justice and to seek structural changes through the American democratic process. DAPRI's members are involved in voter registration, get-out-the-vote activities, political and community education, lobbying, legislative action, and labor support activities in the Detroit and Downriver areas of Michigan.

15. DAPRI works to educate voters about their voting options, to encourage voters to cast their ballots, and to provide assistance to help members of the Detroit/Downriver community vote, both in person and through absentee ballots. Some of DAPRI's work specifically targets voters who are disabled and voters who speak Spanish and Arabic.

16. Over the past six years, DAPRI's members have provided rides to the polls for various members of the community on election day. In addition to providing individuals with rides to the polls, DAPRI provides voters with rides after they cast

their ballots. This direct transportation on election day makes in-person less onerous for hourly workers without personal transportation who would otherwise rely on public transportation. DAPRI intends to continue and expand this work in future elections.

17.     In past elections, DAPRI has worked to inform individuals of their ability to cast absentee ballots. Before Proposal 3, that eligible group of individuals was limited to people who had certain difficulties making it to the polls on election day. Now that Proposal 3 has made absentee voting available to all, DAPRI would like to educate voters about the opportunities to apply to vote absentee in future elections.

18.     Defendant Dana Nessel is the Attorney General of the State of Michigan. Defendant is Michigan's top law enforcement official and responsible for prosecuting the laws of the State of Michigan, including the Voter Transportation Ban and the Absentee Ballot Organizing Ban. Defendant and all Michigan prosecuting attorneys have a duty to investigate and prosecute violations of Michigan election laws like the Voter Transportation Ban and the Absentee Ballot Organizing Ban that appear in Chapter 168 of Michigan Compiled Laws. Mich. Comp. Laws § 168.940. Defendant is sued in her official capacity only.

## JURISDICTION AND VENUE

19.     This action arises under the U.S. Constitution and laws of the United States. Plaintiffs bring this action under the First and Fourteenth Amendments of the U.S. Constitution, which is actionable under 42 U.S.C. § 1983, and the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*.

20.     This Court has original subject-matter jurisdiction of the federal questions presented in this case pursuant to 28 U.S.C. §§ 1331 and 1343.

21.     Venue is proper pursuant to 28 U.S.C. §§ 1391(b) and 1391(c) because Defendant resides and/or conducts business in the Eastern District of Michigan.

22.     Declaratory and injunctive relief is authorized by Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

23.     Plaintiffs Priorities USA, Rise, and DAPRI are injured by the Voter Transportation Ban and the Absentee Ballot Organizing Ban because the statutes proscribe political expression which Plaintiffs desire to engage in. At a minimum, the statutes proscribe offering to assist voters with absentee ballot applications, restrict possession of absentee ballot applications, and ban paying a third party to transport voters to the polls. Plaintiffs desire to do each of these things in violation of the challenge statutes. Plaintiffs have no choice but to abstain from engaging in that conduct because the statutes, without question, ban it. Therefore, the challenged statutes harm Plaintiffs even in the absence of prosecutions because they are required

to abstain from engaging in constitutionally protected political expression. *NAACP v. Button*, 371 U.S. 415, 433 (1963); *Meyer*, 486 U.S. at 417.

24.    Plaintiffs Priorities USA, Rise, and DAPRI are further injured by the Voter Transportation Ban and the Absentee Ballot Organizing Ban because these statutory restrictions frustrate their missions and require Plaintiffs to divert their resources. *See, e.g. Mote v. City of Chelsea*, 284 F. Supp. 3d 863, 887 (E.D. Mich. 2019); *Zynda v. Arwood*, 175 F. Supp. 3d 791, 804 (E.D. Mich. 2016); *see also Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1165–66 (11th Cir. 2008). The challenged statutes frustrate Plaintiffs' mission of, and efforts in, educating, mobilizing, and turning out voters in Michigan by necessarily reducing the transportation options of Michigan citizens to get to polling places and by criminalizing the acts of individuals and organizations that want to (1) transport individuals to vote and (2) assist voters with registering for or returning absentee ballot applications.

25.    Plaintiffs Priorities, Rise, and DAPRI are aware of the Voter Transportation Ban and the Absentee Ballot Organizing Ban and are expending and diverting additional funds and resources in GOTV, voter education efforts, mobilization, and turn out activities in Michigan, at the expense of its other efforts in Michigan, and for Priorities and Rise, at the expense of its efforts in other states, in order to combat the effects of the Voter Transportation Ban and the Absentee

Ballot Organizing Ban. Plaintiffs are required to expend additional resources and employee time to educate their employees, volunteers, and partners about the Voter Transportation Ban and the Absentee Ballot Organizing Ban to avoid exposing them to criminal prosecution.

26.    Getting students to the polls is one of Rise's and DAPRI's programmatic focuses in Michigan. Because of the Voter Transportation Ban, Rise and its student organizers, partners, and volunteers and DAPRI will have to recruit and train volunteers to drive students to voting rather than renting large capacity vehicles such as buses or leveraging existing resources like The Detroit Bus Company (a company that provided transportation to the polls in the Detroit metro area in the last election) and Uber.

27.    Plaintiffs Priorities USA, Rise, and DAPRI are further injured by the Absentee Ballot Organizing Ban and the Voter Transportation Ban because they have abstained and continue to abstain from the political expression proscribed by these statutory restrictions out of a credible fear of prosecution. *See Platt v. Bd. of Comm'rs on Grievances & Discipline of the Ohio Supreme Court*, 769 F.3d 447, 452 (6th Cir. 2014). Defendant and other state officials in Michigan have repeatedly refused to disavow enforcement of the Voter Transportation Ban and the Absentee Ballot Organizing Ban. This refusal to disavow enforcement of the challenged statutes constitutes a credible threat of prosecution. *See id.*

28.     On October 8, 2019, Plaintiff Priorities USA through counsel sent a letter to Secretary of State Jocelyn Benson with Defendant copied on the correspondence laying out Priorities USA's concerns about the Voter Transportation Ban and the Absentee Ballot Organizing Ban. The letter requested an official opinion by Defendant regarding the constitutionality of the statute and generally requested a response by October 21, 2019. Neither Secretary Benson nor Defendant responded to the letter.

29.     On January 11, 2020, Plaintiff Priorities USA through counsel sent a letter to Defendant stating that it is both "contemplating spending money to transport Michigan voters to the polls … by, among other things, funding local efforts to hire vehicles to transport voters to the polls" and "contemplating deploying staff and volunteers to (1) educate Michigan voters about their options to use and request absent voter ballot applications; (2) distribute absent voter ballot applications; (3) offer to return absent voter ballot applications; and (4) actually return absent voter ballot applications." Priorities USA expressed concern that these activities would violate the criminal statutes at issue in this litigation. Priorities USA requested that Defendant "commit to not prosecuting Priorities USA, its agents, and others who engage in such activities." Priorities USA requested a response "to be received no later than January 23, 2020." Again, Defendant did not respond.

30.    On January 10, 2020 via email and on January 13, 2020 via U.S. first class mail, Plaintiff Priorities USA sent letters to all 83 county prosecutors in the State of Michigan with a duty to enforce the Absentee Ballot Organizing Ban and the Voter Transportation Ban. Mich. Comp. Laws § 169.940. Those letters were substantively identical to the one sent to Defendant, requested an assurance that the prosecutors would not enforce the statutes at issue in this litigation against Plaintiffs if they engaged in activity proscribed by the statute. The letters requested a response by January 23, 2020. Five prosecutors responded but refused to commit to not prosecute. The other seventy-eight prosecutors declined to respond.

31.    As of the filing of this Amended Complaint, Defendant and the eighty-three county prosecutors responsible for enforcement of the Absentee Ballot Organizing Ban and the Voter Transportation Ban continue to refuse to disavow prosecution of Plaintiff Priorities USA and others wishing to engage in activity covered by the challenged statutes.

## **GENERAL ALLEGATIONS**

### **The Voter Transportation Ban**

32.    The Voter Transportation Ban provides, in its entirety, that "[a] person shall not hire a motor vehicle or other conveyance or cause the same to be done, for conveying voters, other than voters physically unable to walk, to an election." Mich. Comp. Laws § 168.931(1)(f). Anyone found guilty of violating the Voter

Transportation Ban commits a misdemeanor, *id.*, and faces the prospect of 90 days of imprisonment and a $500 fine, *id.* § 750.504.

33.    The statute does not define what it means to "hire a motor vehicle or other conveyance."

34.    The Voter Transportation Ban burdens get-out-the-vote efforts including specifically rides-to-the-polls and souls-to-the-polls campaigns. These rides-to-the-polls campaigns are a keystone organizing tactic for political and advocacy organizations' efforts to encourage voters to participate in the political process. Often these efforts are part of a core strategy to build political power in targeted communities.[1] For example, these are a common organizing tactic within the African American community. One of Plaintiff DAPRI's get-out-the-vote activities involves driving people to the polls because private transportation is expensive and public transportation is unreliable in the Detroit area. Because of concerns about the time it takes to get to a polling place especially for hourly

---

[1] Many courts have recognized the importance of rides-to-the-polls or souls-to-the-polls efforts to voting especially in minority communities. *Fair Fight Action, Inc. v. Raffensperger*, No. 18-cv-5391, 2019 WL 6836774, at *3-4 (N.D. Ga. May 30, 2019) (finding standing because church that funds rides-to-the-polls will have to divert that funding to otherwise combat voter suppression); *N.C. State Conference of NAACP v. McCrory*, 182 F. Supp. 3d 320, 392 & n. 90 (M.D.N.C. 2016), *rev'd on other grounds*, 831 F.3d 204 (4th Cir. 2016) (discussing the importance of souls-to-the-polls campaigns in evaluating changes to early voting schedule); *Florida v. United States*, 885 F. Supp. 2d 299, 372 (D.D.C. 2012) (same); *One Wisc. Institute, Inc. v. Thomsen*, 198 F. Supp. 3d 896, 924 (W.D. Wisc. 2016) (same).

workers, the DAPRI drives people to the polls and then drives them to work or wherever they need to go after voting.

35.     Although rides-to-the-polls efforts have historically been used in Black church communities, variants are gaining traction among other communities and through the use of rideshare applications like Uber and Lyft. During the 2018 general election, the nonprofit organization Voto Latino partnered with Lyft to provide free rides to the polls to voters in Dodge City, Kansas, a predominately Latinx city, when the polling place was moved to a location outside of town and more than a mile from the nearest public transportation. Avery Anapol, *Lyft partnering with Latino activist group to take voters to polls after only polling station moved*, The Hill (Oct. 22, 2018), https://thehill.com/homenews/campaign/412486-lyft-partnering-with-latino-activist-group-to-take-dodge-city-voters-to-the. Similarly, the National Federation of the Blind partnered with Lyft to provide $15 ride vouchers for blind voters who needed rides to the polls on election day. National Federation of the Blind, *A Lyft to the Polls* (Nov. 1, 2018), https://www.nfb.org/blog/lyft-polls.

36.     Rides-to-the-polls efforts often involve hiring a vehicle, either by hiring taxi services for voters or renting cars to transport voters. At their core, rides-to-the-polls efforts are about convincing individuals to exercise political power by voting. Often rides-to-the-polls efforts rely on both volunteer and paid transportation.

37.     By eliminating the use of hired transportation, the Voter Transportation Ban necessarily reduces the number of drivers and vehicles able to transport Michigan citizens to the polls during early voting and on Election Day. *See Meyer*, 486 U.S. at 419 (explaining that restricting the use of paid help makes it more difficult for organizations to engage in political advocacy). The impact of the Voter Transportation Ban falls directly on those individuals who lack reliable transportation or suffer physical or mental impairments that make travel to the polls difficult or impossible.

38.     The Voter Transportation Ban arbitrarily distinguishes between voters who are disabled. Although the Voter Transportation Ban makes an exception for voters who are disabled such that they cannot walk, it leaves out voters who are able to walk but cannot drive for other reasons. To illustrate, the Voter Transportation Ban makes it a misdemeanor to hire a taxi to take a neighbor to the polls if they suffer from blindness, epilepsy, or other motor control impairments that do not limit the ability to walk, but it is not a misdemeanor to hire a taxi to take a neighbor to the polls who cannot walk.

39.     Because the Voter Transportation Ban criminalizes transportation "to an election" and registration and voting now take place at the same location and on the same date, organizations like Plaintiffs now face criminal charges for spending money to register voters. The law cannot distinguish between transporting voters to

register to vote and transporting voters to vote. Thus, the Voter Transportation Ban burdens Plaintiffs' core political speech.

40.     The Voter Transportation Ban also chills organizational civic engagement. In 2018, the rideshare company Uber provided free and discounted rides to polling places for individuals on Election Day. According to an October 24, 2018 press release, Michigan was the only state for which Uber did not offer this promotion. Danielle Burr, *Update on Uber Drives the Vote* (Oct. 24, 2018), available at https://www.uber.com/newsroom/update-uber-drives-vote/. On information and belief, Uber did not provide Michigan citizens with discounted rides to polling places because of the Voter Transportation Ban.

41.     The Voter Transportation Ban criminalizes the actions of citizens who contribute or spend funds to enable their fellow citizens to participate in the civic process. For example, The Detroit Bus Company, a Low Profit Limited Liability Company, provided Michigan voters with free rides to the polls during the 2018 election. This project cost about $4,000, and The Detroit Bus Company solicited donations from individuals to finance the project. Under the Voter Transportation Ban, the individuals who made non-tax-deductible donations to The Detroit Bus Company for this project could face imprisonment and fines for paying for voters to be transported to the polls. Similarly, other organizations, such as senior centers, nursing homes, churches, labor unions, party organizations, political campaigns, and

student groups risk misdemeanor charges for arranging to bring voters to the polls. Even a neighbor who shares a taxi or Uber to the polls risks criminal liability for doing so under the Voter Transportation Ban. Because it also not is clear exactly what is covered by the law's ban on hiring a motor vehicle or other conveyance, an organization that rents a van and recruits volunteer drivers could also face criminal liability.

42.     There is no compelling justification for the Voter Transportation Ban. To the extent that the Voter Transportation Ban is meant to discourage or criminalize vote buying, that is accomplished through Michigan Compiled Laws § 168.931(b)(i), which makes it a misdemeanor to "receive, agree, or contract for valuable consideration" for "[v]oting or agreeing to vote, or inducing or attempting to induce another to vote, at an election." Michigan law also makes it a felony to bribe a voter. Mich. Comp. Laws § 168.932(a). To that end, there is no adequate justification for the Voter Transportation Ban.

43.     Because the Voter Transportation Ban bans the act of paying to transport voters to the polls, it functions as a $0 spending limitation for persons who seek to transport voters to the polls.

44.     The Voter Transportation Ban's spending limitation applies to elections where federal candidates are on the ballot.

45.     The Federal Election Campaign Act expressly preempts state laws concerning "[l]imitation[s] on contributions and expenditures regarding Federal candidates and political committees." 11 C.F.R. § 108.7(b)(3).

46.     The Voter Transportation Ban is in direct conflict with federal regulations that address election-related spending by corporations and labor organizations. These regulations expressly allow organizations to arrange for vehicles to transport voters to the polls or place of registration, which are now one-and-the-same in Michigan. *E.g.*, 11 C.F.R. § 114.4(d)(1) ("A corporation or labor organization may support or conduct voter registration and get-out-the-vote drives that are aimed at . . . the general public. Voter registration and get-out-the-vote drives include providing transportation to the polls or to the place of registration."). To "provid[e] transportation" to voters and prospective voters, corporations and labor organizations will, in most instances, hire individuals to drive, a violation of the Voter Transportation Ban. Accordingly, the Voter Transportation Ban criminalizes federally sanctioned activities.

### The Absentee Ballot Organizing Ban

47.     Absentee voting is voting that occurs before and on Election Day via mail or in person at a municipal clerk's office (as opposed to in person at a polling location). Absentee voting is more convenient than voting in person at designated polls; not only does it not require travel to a polling location, but it can also be done

over a period of weeks preceding Election Day. Mich. Comp. Laws § 168.759. In

other words, it can be done at the convenience of home (or anywhere) at a time that

does not conflict with work, school, or other obligations, and does not require the

expense, time, and burden of travel and potentially standing in long lines. Absentee

voting is therefore particularly beneficial to students, the elderly, and people who

are disabled, who are likely to have less access to transportation, as well as workers

who may struggle to take sufficient time off to vote in person on Election Day.

48.    In 2018, Michigan joined thirty-eight other states in allowing absentee

voting without any excuse (sometimes called early voting) with the passage of

Proposal 3. Michigan voters passed Proposal 3 by a supermajority. Prior to Proposal

3, only certain Michigan voters could participate in absentee voting (for example,

voters who are disabled, voters over sixty, and pretrial detainees). *See* Mich. Comp.

Laws § 168.758 (repealed 2018). Now all Michigan voters are eligible to participate.

*Id.* § 168.2(a). Election officials in Michigan widely expect absentee voting numbers

to surge in the presidential primary and 2020 general election, the first federal

elections in which no-excuse absentee voting will be available to Michigan voters.

But some voters will be left out of these newfound voting benefits because of the

Absentee Ballot Organizing Ban.

49.    The Absentee Ballot Organizing Ban is comprised primarily of two

parts: (1) a registration requirement that allows only persons who are registered

voters in Michigan to assist voters with their absentee ballot applications and (2) a solicitation ban which bans requesting or soliciting to assist voters with their absentee ballot applications.

50.    Under the Absentee Ballot Organizing Ban, to apply for an absentee ballot, a Michigan voter must submit a signed application to the clerk of the municipality where the voter resides and is registered. *Id.* § 168.759(3); § 168.759(4). But once signed, only the voter or designated groups of people can handle the application, limited to the following: (1) an election official or mail carrier, (2) a member of the applicant's household or immediate family,[2] or (3) a voter registered in Michigan "requested by the applicant to return the application." *Id.* This last category is far more restrictive than it might appear at first blush. Any non-household or family member assisting with an absentee ballot application must not only be a Michigan registered voter, but must sign a certification on the application that reads:

> I certify that my name is .................... , my address is .................... , and my date of birth is ............ ; that I am delivering the absent voter ballot application of .................... at his or her request; that **I did not solicit or request to return the application**; that I have not made any markings on the application; that I have not altered the application in any way; that I have not influenced the applicant; and that I am aware that a false statement in this certificate is a violation of Michigan election law.

---

[2] Immediate family is "an individual's father, mother, son, daughter, brother, sister, and spouse and a relative of any degree residing in the same household as that individual." Mich. Comp. Laws § 168.2(l).

*Id.* § 168.759(5) (emphasis added). Any false statement on an absentee ballot application, including on the certification, is punishable as a misdemeanor. *Id.* § 168.759(8). An unauthorized person who distributes and returns an application is also guilty of a misdemeanor. *Id.* Despite these criminal penalties, the statute provides no guidance for what constitutes soliciting or requesting to return an absentee ballot application.

51.     Political organizing to encourage and assist absentee voting is a traditional and effective means to increase voter participation. It is common for political campaigns and for advocacy organizations to educate voters about their options to vote absentee, to encourage voters to take advantage of the conveniences of absentee voting, and to offer assistance and to assist voters in voting absentee. These interactions foster conversations about why voting is important and are often platforms for discussions about the relative merits of candidates and other measures on the ballot.

52.     The Absentee Ballot Organizing Ban is particularly troublesome given the recent changes to absentee voting laws in 2018. As a result of Proposal 3, all Michigan citizens are entitled to vote early or by absentee ballot without excuse. *Id.* § 168.759(1), (2). Prior to Proposal 3, Michigan Compiled Laws § 168.758 limited the availability of absentee voting to certain subsets of voters. The Absentee Ballot

Organizing Ban will have a chilling effect on efforts to educate voters about these newfound benefits.

53.    The Absentee Ballot Organizing Ban is not justified by any state interest in preventing voter fraud. The transaction the Organizing Ban regulates—the submission of an application for an absentee ballot—is attenuated from the points in voting where fraud can even occur. The Organizing Ban does not regulate who is eligible to vote or the ballots actually cast. To the extent that submitting an application facilitates fraud, the other procedures in the absentee voting system address that issue. In particular, an unauthorized third party who submits an absentee ballot application cannot obtain the actual ballot (a ballot will only be turned over in person or mailed directly to the voter). *Id.* § 168.761(3), (6). And if a voter were to receive an absentee ballot that the voter did not request, the voter could still vote in person at the polls and his or her absentee ballot would be cancelled. *Id.* § 168.769. Finally, a list of where and to whom absentee ballots were mailed is made public. *Id.* § 168.760.

54.    The other protections for the sanctity of the absentee voting process in the Michigan Election Laws are myriad. Interference with absentee voting is criminalized in at least **seven** other ways:

a.    It is a felony to forge a signature on an absentee ballot application, *id.* § 168.759(8);

b.    It is a felony to mark, alter, or switch out the absentee ballot itself, *id.* § 168.932(e);

c.    It is a felony to possess an absentee ballot belonging to another, *id.* § 168.932(f);

d.    It is a felony to "[s]uggest or in any manner attempt to influence" a voter filling out an absentee ballot, *id.* § 168.932(g), (h).

e.    It is a felony to bribe a voter, *id.* § 168.932(a);

f.    It is a misdemeanor to promise or receive something of value for deciding whether and for whom to vote, *id.* § 168.931(1)(a), (b); and

g.    It is a misdemeanor to, in any other way, violate the Michigan Election Laws, *id.* § 168.931(2).

These criminal provisions diminish the need for the Absentee Ballot Organizing Ban. *See Buckley*, 525 U.S. at 204-05; *Meyer*, 486 U.S. at 427.

## CAUSES OF ACTION

### COUNT I
### U.S. Const. Amend. I and XIV, 42 U.S.C. § 1983,
### 28 U.S.C. § 2201, 28 U.S.C. § 2202
### (The Absentee Ballot Organizing Ban is Unconstitutionally Vague and Overbroad)

55.    The Absentee Ballot Organizing Ban's solicitation ban is unconstitutionally vague. The solicitation ban prohibits "solicit[ing] or request[ing] to return" an absentee ballot application. Mich. Comp. Laws § 168.759(4), (5).

56.    Any state criminal law that is "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement" violates the Due Process Clause of the Fourteenth Amendment. *See*

*United States v. Johnson*, 135 S. Ct. 2551, 2556 (2015) (applying the Due Process Clause of the Fifth Amendment to strike down a federal criminal law). When a criminal law effects political expression, the "standards of permissible statutory vagueness are strict." *Button*, 371 U.S. at 432.

57.    The Absentee Ballot Organizing Ban does not provide any guidance on what it means to solicit or request to return an absentee ballot application. For example, it is unclear whether an organizer solicits a voter to return an absentee ballot application when the organizer informs the voter of the voter's right to participate in absentee voting including the voter's right to request assistance with delivering an application. This interaction—whereby an organizer provides factually accurate information to a voter about the voter's rights—cannot be constitutionally proscribed. *See id.* at 434; *cf. United State v. Hylton*, 710 F.2d 1106, 1111 (5th Cir. 1983) (holding that the First Amendment prohibited punishing an individual for "filing a factually accurate, nonfraudulent criminal complaint"). Nothing in the solicitation ban, however, prevents application of the ban to just this interaction. "There thus inheres in the statute the gravest danger of smothering all discussion looking to the" exercise of voter's right to vote absentee. *Button*, 371 U.S. at 434.

58.    The solicitation ban's vagueness is particularly troublesome given the recent expansion of absentee voting rights to all Michigan voters. Political campaigns and advocacy organizations, like Plaintiffs, have a significant interest in

educating voters about their new rights. But what organization will ask persons to risk criminal sanction to educate voters about how to exercise their right to absentee vote? The solicitation ban will chill these conversations. *Id.* at 432; *cf. Hargett*, 400 F. Supp. 3d at 720.

59.     The solicitation ban is therefore unconstitutionally vague under the Due Process Clause and vague and overbroad under the First Amendment to the U.S. Constitution.

## COUNT II
### U.S. Const. Amend. I and XIV, 42 U.S.C. § 1983, 28 U.S.C. § 2201, 28 U.S.C. § 2202
### (The Absentee Ballot Organizing Ban Violates Speech and Associational Rights Protected by the First and Fourteenth Amendments)

60.     Plaintiffs hereby incorporate all other paragraphs as if fully set forth herein.

61.     The Absentee Ballot Organizing Ban regulates core political expression (that is, speech and associational conduct). The Supreme Court and courts across the country have repeatedly described activities aimed at encouraging voters to participate in the political process as constitutionally protected political expression. *See Buckley*, 525 U.S. at 193; *Meyer*, 486 U.S. at 421; *Hargett*, 400 F. Supp. 3d at 720; *League of Women Voters of Fla.*, 863 F. Supp. 2d at 1158; *Project Vote*, 455 F. Supp. 2d at 700; *Hernandez*, 714 F. Supp. at 973 ("Where groups, formal or informal, seek to advance their goals through the electoral process, [restrictive]

regulations … impair their ability effectively to organize and make their voices heard."); *see also Button*, 371 U.S. at 437 ("Free trade in ideas means free trade in the opportunity to persuade to action." (citations omitted)).

62.    "Political speech is at the core of First Amendment protections." *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 473 (6th Cir. 2016). The Absentee Ballot Organizing Ban is subject to strict scrutiny review because it proscribes political expression based on the identity of the speaker. *See id.*; *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340-41, 366 (2010). Therefore, the Ban must be narrowly tailored to serve a compelling government interest. *Citizens United*, 558 U.S. at 340. The solicitation ban is further subject to strict scrutiny because it serves as a content-based restriction on speech. *Berger v. City of Seattle*, 569 F.3d 1029, 1051-52 (9th Cir. 2009) (applying strict scrutiny to a law that banned active solicitation of donations because it made a content-based restriction); *see also Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642-43 (1994); *Burson v. Freeman*, 504 U.S. 191, 197 (1992); *Planet Aid v. City of St. Johns, MI*, 782 F.3d 318, 326 (6th Cir. 2015); *Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1489 (6th Cir. 1995). The Absentee Ballot Organizing Ban otherwise directly regulates core political expression and is therefore subject to exacting scrutiny. *See Hargett*, 400 F. Supp. 3d at 722 ("The Supreme Court, accordingly, has applied 'exacting scrutiny'—not *Anderson-Burdick*—to cases governing election-related

speech rather than 'the mechanics of the electoral process.'" (citations omitted)); *see also Citizens United*, 558 U.S. at 366-67. *But see Buckley*, 525 U.S. at 207 (Thomas J. concurring) (arguing that strict scrutiny applies even to laws that affect but do not directly regulate core political speech). Exacting scrutiny requires a substantial relationship between the challenged regulation and a sufficiently important governmental interest. *Citizens United*, 558 U.S. at 366-67; *John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010). "[T]he strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *John Doe No. 1*, 561 U.S. at 196.

63.    The Absentee Ballot Organizing Ban bears no fair relationship to prevention of voting fraud or any other important government interest. As a result, the Absentee Ballot Organizing Ban violates the First and Fourteenth Amendment to the U.S. Constitution.

## COUNT III
### U.S. Const. Amend. XIV, 42 U.S.C. § 1983, 28 U.S.C. § 2201, 28 U.S.C. § 2202
### (The Absentee Ballot Organizing Ban Imposes an Undue Burden on the Fundamental Right to Vote)

64.    Plaintiffs hereby incorporate all other paragraphs as if fully set forth herein.

65.    The Absentee Ballot Organizing Ban's registration requirement is an undue burden on the fundamental right to vote protected by the Fourteenth Amendment to the U.S. Constitution.

66.     Fourteenth Amendment undue burden claims are analyzed under the *Anderson-Burdick* framework. Under *Anderson-Burdick*, a reviewing court considers "the relative interests of the State and the injured voters," and evaluates "the extent to which the State's interests necessitated the contested restrictions." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995). The more severe the burden on First and Fourteenth Amendment rights created by a regulation, the more severe the scrutiny applied to the regulation. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

67.     The registration requirement bears no fair relationship to preventing voting fraud or any other important government interest.

68.     Conversely, the registration requirement severely burdens the fundamental right to vote by limiting the number of people available to assist voters in submitting their absentee ballot applications. For example, a voter could not ask someone who is not a registered voter in Michigan to help with taking the application to the post office, scanning and emailing the application, or faxing the application.

69.     The registration requirement removes approximately 750,000 voting eligible Michigan residents who are not registered to vote from the population of persons available to assist voters in submitting absentee ballot applications. That 750,000 persons does not include the hundreds of thousands of voting age persons

who are not eligible to vote in Michigan or persons—registered, voting eligible, or otherwise—who do not permanently reside in Michigan.

## COUNT IV
### Violation of Section 208 of the Voting Rights Act of 1965, 52 U.S.C. § 10508
### (Federal Law Supersedes and Preempts the Absentee Ballot Organizing Ban)

70.     Plaintiffs hereby incorporate all other paragraphs as if fully set forth herein.

71.     The Absentee Ballot Organizing Ban conflicts with and violates Section 208 of the Voting Rights Act, 52 U.S.C. § 10508, and is thus preempted and invalid. *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) ("[S]tate laws that conflict with federal law are without effect." (citations omitted)); *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (conflict preemption occurs when (a) it is physically impossible to comply with state and federal law, or (b) "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress").

72.     Section 208 of the Voting Rights Act provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice." Within the context of the Voting Rights Act, the act of voting includes "all action necessary to make a vote effective in any primary, special, or general election." 52 U.S.C. § 10310(c)(1). This includes all stages of applying for an absentee ballot. *OCA-Greater Houston v.*

*Texas*, 867 F.3d 604, 615 (5th Cir. 2017) ("'To vote,' therefore, plainly contemplates more than the mechanical act of filling out the ballot sheet. It includes steps in the voting process *before entering* the ballot box, 'registration,' and it includes steps in the voting process *after leaving* the ballot box, 'having such ballot counted properly.' Indeed, the definition lists 'casting a ballot' as only one example in a nonexhaustive list of actions that qualify as voting.")

73.     Congress passed the Voting Rights Act to correct entrenched "racial discrimination in voting" that was "an insidious and pervasive evil." *South Carolina v. Katzenbach*, 383 U.S. 301, 308-09 (1966). In recommending that Section 208 be added to the Voting Rights Act, the Senate Judiciary Committee recognized that voters who do not speak English and voters with disabilities "run the risk that they will be discriminated against at the polls and that their right to vote in State and Federal elections will not be protected." S. Rep. No. 97-417, at 62 (1982). To limit that risk, those voters "must be permitted to have the assistance of a person of their own choice." *Id.*

74.     Section 208 preempts the portions of the Absentee Ballot Organizing Ban that restrict who can provide voters with assistance because the state law criminalizes conduct expressly allowed by Section 208. The Absentee Ballot Organizing Ban unlawfully limits the rights afforded to voters by Section 208 by prohibiting voters who need help returning their absentee ballot applications from

receiving assistance from the person of their choice. *See* Mich. Comp. Laws § 168.759(3); § 168.759(4). Under Michigan Law, a voter must choose from a specific list of individuals to help them return their absentee ballot applications and is not free to choose anyone who is not a registered Michigan voter. *Id.* Section 208 cannot be interpreted to permit this portion of the Absentee Ballot Organizing Ban to stand. *See OCA-Greater Houston*, 867 F.3d at 615 (Section 208 preempted a Texas law restricting who may provide interpretation assistance to English-limited voters); *United States v. Berks Cty.*, 277 F. Supp. 2d 570, 580 (E.D. Pa. 2003) (county election law restricting who may provide language assistance to Spanish-speaking voters violated Section 208).

75.     In fact, in its report recommending that this protection be added to the Voting Rights Act, the Senate Judiciary Committee noted that state restrictions that "deny the assistance at some stages of the voting process during which the assistance was needed" would violate Section 208. S. Rep. No. 97-417, at 63 (1982). By prohibiting a voter who needs assistance completing their absentee ballot application from being helped by anyone who *offers* to help them, the Absentee Ballot Organizing Ban also violates Section 208.

76.     The Absentee Ballot Organizing Ban affects disproportionately Michigan citizens with disabilities. In 2012, "close to one-tenth of people with disabilities who voted by mail reported having difficulties in doing so, saying they

needed assistance filling out or sending the ballot." Lisa Schur et al., *Accessible Democracy: Reducing Voting Obstacles for People with Disabilities*, 14 Election Law J. 60, 63 (2015). The Absentee Ballot Organizing Ban makes it harder for those Michigan citizens to vote because it adds an additional hurdle to even receiving the absentee ballot.

77.    As a result of the Absentee Ballot Organizing Ban, Michigan voters with language barriers or disabilities are denied the voting assistance that Section 208 of the Voting Rights Act guarantees them.

**COUNT V**
**U.S. Const. Amend. I and XIV, 42 U.S.C. § 1983,**
**28 U.S.C. § 2201, 28 U.S.C. § 2202**
**(The Voter Transportation Ban is Unconstitutionally Vague and Overbroad)**

78.    Plaintiffs hereby incorporate all other paragraphs as if fully set forth herein.

79.    The Voter Transportation Ban is unconstitutionally vague under the First and Fourteenth Amendment. It criminalizes the act of "hir[ing] a motor vehicle" to transport voters to the polls unless those voters are "physically unable to walk." Mich. Comp. Law. § 168.931(f).

80.    The Voter Transportation Ban does not provide any guidance on what it means to hire a motor vehicle. For example, it is unclear whether an individual hires a motor vehicle when they take a taxi or an Uber to the polls and allow a neighbor to accompany them for free. It is unclear whether an organization that rents

a vehicle for election day that volunteer drivers use to take voters to the polls have hired a vehicle. And it is unclear whether the act of providing a driver who takes voters to the polls with any sort of compensation, be it in the form of a wage, a stipend, or gas money, constitutes hiring a vehicle for the purposes of the Voter Transportation Ban

81.    The Voter Transportation Ban is therefore unconstitutionally vague under the Due Process Clause and vague and overbroad under the First Amendment to the U.S. Constitution.

**COUNT VI**
**U.S. Const. Amend. I and XIV, 42 U.S.C. § 1983,**
**28 U.S.C. § 2201, 28 U.S.C. § 2202**
**(The Voter Transportation Ban Violates Speech and Associational Rights Protected by the First and Fourteenth Amendments)**

82.    Plaintiffs hereby incorporate all other paragraphs as if fully set forth herein.

83.    The Voter Transportation Ban burdens core political expression and acts as a ban on political expenditures. Accordingly, is subject to, at a minimum, exacting scrutiny. *See Citizens United*, 558 U.S. at 366-67; *Meyer*, 486 U.S. at 420; *Buckley v. Valeo*, 424 U.S. 1, 25, 44-45 (1976); *Hargett*, 400 F. Supp. 3d at 722.

84.    The Voter Transportation Ban bears no fair relationship to preventing voting fraud or any other important government interest. Therefore, the Voter

Transportation Ban violates the First and Fourteenth Amendment to the U.S. Constitution.

85.     The Voter Transportation Ban imposes a $0 spending limitation on the act of transporting voters to the polls. The act of transporting voters to the polls is a recognized element of voter registration and get-out-the-vote drives. *E.g.*, 11 C.F.R. § 114.4(d)(1) ("Voter registration and get-out-the-vote drives include providing transportation to the polls or to the place of registration."). And as now-Justice Kavanaugh noted in *Emily's List v. Federal Election Commission*, organizations "are entitled to spend and raise unlimited money for those activities." 581 F.3d 1, 16 (D.C. Cir. 2009) (referring to "advertisements, get-out-the-vote efforts, and voter registration drives").

86.     A long line of Supreme Court precedent holds that any regulation of political spending must be "'closely drawn' to serve a cognizable anticorruption interest." *Emily's List*, 581 F.3d at 18 (citing *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 735 (2008)); *Fed. Election Comm'n v. Wisc. Right to Life, Inc.*, 551 U.S. 449, 478-80 (2007); *Fed. Election Comm'n v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 496-97 (1985); *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley, Cal.*, 454 U.S. 290, 296-97 (1981); *Valeo*, 424 U.S. at 26-27.

87.    No such anticorruption justification exists for the Voter Transportation Ban, and even if one did exist, the law is not closely drawn to address it. Because the Voter Transportation Ban is not closely drawn to serve an anticorruption interest, it violates the First and Fourteenth Amendments to the U.S. Constitution.

## COUNT VII
### U.S. Const. Amend. XIV, 42 U.S.C. § 1983, 28 U.S.C. § 2201, 28 U.S.C. § 2202
### (The Voter Transportation Ban Creates an Undue Burden on the Fundamental Right to Vote)

88.    Plaintiffs hereby incorporate all other paragraphs as if fully set forth herein.

89.    The Voter Transportation Ban is an undue burden on the fundamental right to vote protected by the Fourteenth Amendment to the U.S. Constitution.

90.    The Voter Transportation Ban bears no fair relationship to preventing voting fraud or any other important government interest.

91.    Conversely, the Voter Transportation Ban severely burdens the fundamental right to vote. The Voter Transportation Ban increases the costs of voting by requiring voters to pay the full cost of finding private transportation to the polls, *see Veasy v. Abbott*, 830 F.3d 216, 263 (5th Cir. 2016) (Higginson, J., joined by Costa, J., concurring), and by necessarily reducing the transportation available to voters, *see Meyer*, 486 U.S. at 419. For those voters who cannot secure private transportation and must rely on foot or public transportation, the Voter Transportation Ban significantly increases the amount of time it takes to vote. It

follows, therefore, that restrictions on voter transportation will prevent voters from casting ballots.

## Count VIII
### Declaratory Judgment Act 28 U.S.C. § 2201, 28 U.S.C. § 2202
### (Federal Law Supersedes and Preempts the Voter Transportation Ban)

92.    Plaintiffs hereby incorporate all other paragraphs as if fully set forth herein.

93.    Pursuant to 52 U.S.C. § 30143, rules prescribed under the Federal Election Campaign Act of 1971 (FECA), as amended, "supersede and preempt any provision of State law with respect to election to Federal office." Federal Election Commission regulations promulgated pursuant to FECA further articulate the scope of this preemption. 11 C.F.R. § 108.7 (expanding on the preemptive scope of FECA and FECA regulations).

94.    Federal Regulation 11 C.F.R. § 114.4 was promulgated pursuant to FECA, which regulates political campaign spending and fundraising. In relevant part, the regulation permits corporations and labor organizations to spend money to transport members of the general public to the polls through voter registration and get-out-the-vote drives. *Id.* § 114.4(d)(1). Similarly, 11 C.F.R. § 114.3(c)(4)(i) permits corporations and labor organizations to spend money to transport a smaller subset of the general public to the polls.

95.    By contrast, the Voter Transportation Ban effectively serves as a $0 spending limitation for transporting voters to the polls.

96.    The Voter Transportation Ban is preempted by FECA and its regulations through either express or conflict preemption, and Defendant should be enjoined from enforcing it during elections when candidates for federal office are on the ballot. *E.g.*, *Republican Party of N.M. v. King*, 850 F. Supp. 2d 1206, 1216 (D.N.M. 2012), *aff'd*, 741 F.3d 1089 (10th Cir. 2013) (enjoining enforcement of state campaign spending law with respect to federal office holders); *Weber v. Heaney*, 793 F. Supp. 1438 (D. Minn. 1992), *aff'd*, 995 F.2d 872 (8th Cir. 1993) (holding that FECA preempted voluntary state spending limitations).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendant, and:

a.    Declare, under the authority granted to this Court by 28 U.S.C. § 2201, that (1) Michigan Compiled Laws § 168.759(4), (5), and (8) (the "Absentee Ballot Organizing Ban") and Michigan Compiled Laws § 168.931(1)(f) (the "Voter Transportation Ban") are preempted by federal law; and (2) the Absentee Ballot Organizing Ban and Voter Transportation Ban violate the First and Fourteenth Amendments to the U.S. Constitution;

b.      Preliminarily and permanently enjoin Defendant and her agents,
officers, employees, successors, and all persons acting in concert with
each or any of them from enforcing Michigan Compiled Laws §
168.759(4), (5), and (8) and Michigan Compiled Laws § 168.931(1)(f);

c.      Award Plaintiffs their costs, disbursements, and reasonable attorneys'
fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and
other applicable laws; and

d.      Grant Plaintiffs such other and further relief as the Court deems
necessary and proper.

Dated: January 27, 2020

Kevin J. Hamilton
PERKINS COIE LLP
1201 3rd Ave.
Seattle, WA 98101
Telephone: (206) 359-8000
Facsimile: (206) 359-9741
khamilton@perkinscoie.com

Sarah S. Prescott, Bar No. 70510
SALVATORE PRESCOTT &
PORTER, PLLC
105 E. Main Street
Northville, MI 48168

*Attorneys for Plaintiffs*

Respectfully submitted,

By:  \_\_/s/ Marc E. Elias_____
Marc E. Elias
Christopher J. Bryant
Courtney A. Elgart*
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
melias@perkinscoie.com
cbryant@perkinscoie.com
celgart@perkinscoie.com

*Attorneys for Plaintiffs*
*Seeking Admission to E.D. Mich.

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2020, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record.

Respectfully submitted,

By:   /s/ Marc E. Elias
Marc E. Elias
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
melias@perkinscoie.com