UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

Priorities USA, Rise, Inc., and the
Detroit/Downriver Chapter of the A.
Philip Randolph Institute,

                Plaintiffs,

v.

Dana Nessel, in her official capacity as
Attorney General of the State of
Michigan,

                Defendant.

NO. 20-10211

JUDGE MARK A. GOLDSMITH

MAGISTRATE JUDGE DAVID
R. GRAND

**PLAINTIFFS' MEMORANDUM
IN SUPPORT OF THEIR
MOTION FOR A
PRELIMINARY AND
PERMANENT INJUNCTION**

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES PRESENTED ...................................................... iii

CONTROLLING OR MOST APPROPRIATE AUTHORITY ............................... v

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 3

   I.   Procedural Background .................................................................................. 4

   II.  The Challenged Statutes ............................................................................... 5

     A.  The Absentee Ballot Organizing Ban ..................................................... 6

     B.  The Voter Transportation Ban ............................................................... 11

LEGAL STANDARD ........................................................................................... 13

ARGUMENT ........................................................................................................ 14

   I.   Plaintiffs' claims are meritorious. .............................................................. 14

     A.  The Absentee Ballot Organizing Ban is unconstitutional and preempted by federal law. ............................................................................................... 15

        1.   The Absentee Ballot Organizing Ban is an unconstitutional infringement of First and Fourteenth Amendment speech and association rights. ............. 15

          a.   The Registration Requirement ........................................................... 20

          b.   The Solicitation Ban ......................................................................... 21

        2.   The solicitation ban is unconstitutionally vague and overbroad. ........... 23

        3.   The registration requirement imposes an undue burden on the fundamental right to vote. ............................................................................ 25

        4.   The Voting Rights Act preempts the Absentee Ballot Organizing Ban. 27

     B.  The Voter Transportation Ban is unconstitutional and preempted by federal law. ............................................................................................... 30

        1.   The Voter Transportation Ban is an unconstitutional infringement of First and Fourteenth Amendment speech and association rights. ................. 30

          a.   The ban unconstitutionally burdens core political expression ......... 30

          b.   The ban unconstitutionally restricts political expenditures .............. 32

        2.   The Voter Transportation Ban is unconstitutionally vague and overbroad. ................................................................................................... 35

        3.   The Voter Transportation Ban places an undue burden on the fundamental right to vote. ............................................................................ 36

i

4.   Federal law preempts the Voter Transportation Ban. ............................38

a.   The FECA's preemption provision and its accompanying regulation expressly preempt the Voter Transportation Ban. ....................................38

b.   The Voter Transportation Ban is impliedly preempted. ...................40

II.   Plaintiffs will suffer irreparable harm without a preliminary injunction. .....43

III.   A preliminary injunction will not cause substantial harm to others. .........44

IV.   A preliminary injunction is in the public interest. ....................................45

CONCLUSION ......................................................................................................46

## STATEMENT OF THE ISSUES PRESENTED

Plaintiffs Priorities USA, Rise, Inc., and the Detroit/Downriver Chapter of the A. Philip Randolph Institute seek a preliminary and permanent injunction[1] to enjoin the enforcement of two Michigan laws that criminalize core political activity and, in some cases, conflict with federal law: (1) the Absentee Ballot Organizing Ban,[2] which prohibits large categories of people both from requesting or soliciting to help voters with their absentee ballot applications and from assisting in returning those applications at the risk of criminal penalties; and (2) the Voter Transportation Ban,[3] which criminalizes the act of paying money to transport voters to the polls and therefore effectively sets a spending limitation of $0 for that activity.

The Court should enjoin both of these laws. First, Plaintiffs' claims are likely to succeed on the merits. Michigan's *Absentee Ballot Organizing Ban* violates the First and Fourteenth Amendments to the U.S. Constitution because it imposes an unconstitutional burden on political expression, unduly burdens the fundamental right to vote, and is vague and overbroad. Federal law in any event preempts the Absentee Ballot Organizing Ban's restriction on who voters can request assistance from in submitting absentee ballot applications. Michigan's *Voter Transportation*

---

[1] Plaintiffs are simultaneously filing a motion to consolidate trial on the merits with the hearing on this motion pursuant to Fed. R. Civ. P. 65(a)(2).
[2] Mich. Comp. Laws § 168.759(4), (5), (8); and (2).
[3] Mich. Comp. Laws § 168.931(1)(f).

*Ban* violates the First and Fourteenth Amendments to the U.S. Constitution because it burdens political expression, unconstitutionally limits political expenditures, and unduly burdens the fundamental right to vote. Federal law also preempts the Voter Transportation Ban's limitation on political expenditures.

Second, Plaintiffs will suffer irreparable injury absent the issuance of an injunction. Not only is irreparable injury presumed when constitutional rights are violated, but with the 2020 election less than ten months away, Plaintiffs will suffer irreparable harm if they continued to be restricted from engaging in political speech and making political expenditures.

Third, an injunction will not inflict substantial harm to others. To the contrary, because the laws at issue serve no important governmental interest, an injunction will harm no one.

Fourth and finally, the public interest will be furthered by issuance of the injunction, which would remove state law obstacles to core political speech as well as access to the polls, plainly benefitting the voters of the State by removing unconstitutional barriers to the exercise of fundamental rights and invalidating plainly federally preempted state law.

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

**Cases**

*Buckley v. Am. Const'l Law Found., Inc.*, 525 U.S. 182 (1999)

*Buckley v. Valeo*, 424 U.S. 1 (1976)

*Citizens United v. Fed. Elec. Comm'n*, 558 U.S. 310 (2010)

*Emily's List v. Fed. Election Comm'n*, 581 F.3d 1, 16 (D.C. Cir. 2009)

*League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, (M.D. Tenn. 2019)

*Meyer v. Grant*, 486 U.S. 414 (1988)

*NAACP v. Button*, 371 U.S. 415 (1963)

*OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017)

*Weber v. Heaney*, 793 F. Supp. 1438 (D. Minn. 1992), *aff'd*, 995 F.2d 872 (8th Cir. 1993)

**Statutes and Regulations**

Michigan Compiled Laws § 168.931

Michigan Compiled Laws § 168.759

52 U.S.C. § 30143

11 C.F.R. § 108.7

11 C.F.R. § 114.3

11 C.F.R. § 114.4

**INTRODUCTION**

Michigan election law criminalizes core political activity. A mother living in Lansing who calls an Uber for her daughter away at college in Ann Arbor to go vote. A teenager who offers to assist his elderly neighbor with scanning her absentee ballot application and emailing it back to the clerk's office. A pastor who rents a van to drive her parishioners to the polls after church. A student organizer who encourages his fellow students to vote absentee and offers to help. The parent, the neighbor, the pastor, and the student organizer are all subject to criminal prosecution, imprisonment, and fines under Michigan's Voter Transportation Ban and Absentee Ballot Organizing Ban. These laws criminalize basic acts of association and core political speech. As a result, they cannot stand.

"[T]he citizen who distributes his party's literature, who helps to register voters, or who transports voters to the polls on Election Day performs a valuable public service" that supports our democratic process. *Branti v. Finkel*, 445 U.S. 507, 529 n. 10 (1980) (Powell, J., dissenting). These acts, geared towards persuading others to action, not only support the democratic process but also represent protected political expression. *E.g.*, *NAACP v. Button*, 371 U.S. 415, 437 (1963). The Supreme Court has "made clear that the First and Fourteenth Amendments guarantee freedom to associate with others for the common advancement of political beliefs and ideas." *Buckley v. Valeo*, 424 U.S. 1, 15 (1976) (internal quotation marks omitted). It

necessarily follows that laws that regulate political expression imprecisely or without adequate justification cannot stand. *Button*, 371 U.S. at 429-32.

Michigan's Absentee Ballot Organizing Ban and Voter Transportation Ban impose substantial burdens on core political expression and activity.[4] The first restricts who can communicate with and assist Michigan voters to apply for an absentee ballot. The second restricts anyone from paying to transport voters to the polls. Both stand in the way of efforts to mobilize voters to participate in the electoral process and thereby increase political power in historically disenfranchised communities, particularly with voters who have been underrepresented at the polls because they face difficulties getting to the polls on election day. These statutes curb the efforts of organizations like Plaintiff Rise, Inc., which seeks to increase the engagement of college students in the electoral process; Plaintiff Detroit/Downriver Chapter of the A. Philip Randolph Institute (" DAPRI"), which seeks to mobilize voters to support economic and social justice, and Plaintiff Priorities USA who wish to encourage voters to build a progressive movement.

There are only 42 days until the Michigan primary election and only 280 days until the 2020 general election, which will include highly competitive races for federal offices. Because each election is a unique, non-repeatable occurrence, no

---

[4] Michigan Compiled Laws § 168.759(4), (5), (8) comprise the Absentee Ballot Organizing Ban. The Voter Transportation Ban is at Michigan Compiled Laws § 168.931(1)(f).

amount of monetary damages can make Plaintiffs whole if the Absentee Ballot Organizing Ban and Voter Transportation Ban remain in place in the lead up to the upcoming primary and general elections. "[O]nce the election occurs, there can be no do-over and no redress." *League of Women Voters of N. C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). And each day lost is an opportunity lost to fundraise, recruit, and organize around activities specifically regulated by the bans— applying for absentee ballots and transporting voters to the polls. Accordingly, Plaintiffs request a preliminary and permanent injunction against the enforcement of the challenged provisions to promote the public interest in "robust enforcement of constitutional rights." *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp. (SMART)*, 698 F.3d 885, 896 (6th Cir. 2012).

## BACKGROUND

A supermajority of Michigan voters expressed an unequivocal desire to expand access to voting for all Michigan citizens with passage of Proposal 3 in 2018. Secretary of State's Office, 2018 Michigan Election Results (Nov. 26, 2018), available at https://mielections.us/election/results/2018GEN_CENR.html. Proposal 3 enshrined in the Michigan Constitution eight enumerated voting rights all aimed at expanding access to the ballot and making it easier to vote. Included in these

expanded rights are no-excuse absentee voting by mail and in-person early voting.[5]

The Voter Transportation Ban and Absentee Ballot Organizing Ban stand in stark contrast to the expanded access to the franchise ushered in by Proposal 3. Both impose significant impediments to voting—impediments that fall particularly hard on student voters, voters who are disabled, and minority voters. Neither statute can withstand constitutional scrutiny.

## I.    Procedural Background

Plaintiff Priorities USA filed an initial complaint on November 12, 2019, challenging the constitutionality of the Absentee Ballot Organizing Ban and the Voter Transportation Ban. Civ. Act. No. 19-13341 Dkt. 1. Defendant Attorney General Dana Nessel filed a motion to dismiss on December 20, 2019. Dkt. 10. In response, and with the court's permission, Dkt. 13, Plaintiffs recently filed an amended complaint in that case. Dkt. 17. That amended complaint adds Rise and DAPRI as plaintiffs and states additional facts to support standing. *Id.* Out of an

---

[5] Absentee voting is voting that occurs before and on election day via mail or in person at a municipal clerk's office (as opposed to in person at a polling location). 38 other states allow no-excuse absentee voting by mail and in-person early voting. For a compilation of the relevant absentee voting statutes in other states, see Nat'l Conf. of State Legs., *State Laws Governing Early Voting* (Aug. 2, 2019), available at https://www.ncsl.org/research/elections-and-campaigns/early-voting-in-state-elections.aspx. For a visual presentation of that information, see Nat'l Conf. of State Legs., Absentee and Early Voting (Nov. 7, 2019), available at https://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx.

abundance of caution and to ensure that jurisdictional requirements are met, Plaintiffs have filed an identical, related complaint against Defendant and moved to consolidate the two. Dkt. 20; Civ. Act. No. 20-10211 Dkt. 5. Plaintiffs are also filing a motion for an expedited schedule and, pursuant to Federal Rule of Civil Procedure 65(a)(2), for consolidation of the consideration of this motion with the trial on the merits to ensure final resolution of this case in time for the 2020 general election contemporaneously with this motion.

## II.   The Challenged Statutes

The Absentee Ballot Organizing Ban and the Voter Transportation Ban criminalize organizing activities which are ubiquitous throughout the United States. Declaration of Maxwell Lubin of Rise, Inc. dated Jan. 27, 2020 ("Lubin Decl.") ¶¶ 11, 12, 14, 18; Declaration of Nse Ufot of the New Georgia Project dated Jan. 27, 2020 ("Ufot Decl.") ¶ 4. These laws significantly hamper the efforts of organizations like Plaintiffs Rise, DAPRI, and Priorities USA to organize and mobilize their core constituencies. For example, in other states where paying for transportation to the polls is not illegal, Rise, a student-led non-profit that advocates for free public higher education and an end to campus food and housing insecurity, has funded successful "party to the polls" events on college campuses which include free and discounted rides to the polls with Lyft or Uber. Lubin Decl. ¶¶ 11, 12. Rise's Michigan operation has refrained from executing similar projects because of the Voter Transportation

Ban. Lubin Decl. ¶ 25. The DAPRI, a local chapter of the labor-focused civil rights organization founded by iconic civil rights leaders A. Philip Randolph and Baynard Rustin, has run operations driving people to and from work and the polls for six years, but the Voter Transportation Ban limits the scope of its operations. Declaration of Andrea Hunter of the Detroit/Downriver Chapter of the A. Philip Randolph Institute dated Jan. 28, 2020 ("Hunter Decl.") ¶¶ 13, 14. And the Absentee Ballot Organizing Ban poses a significant threat to its absentee ballot organizing efforts, which it considers mission critical. Hunter Decl. ¶ 20-22. For Priorities USA, a nonprofit, voter-centric progressive advocacy and service organization, the Voter Transportation Ban and the Absentee Ballot Organizing Ban have limited the scope of their efforts in Michigan, a state it has prioritized with three others for $150 million in voter education and mobilization efforts in the lead up to the 2020 election. Declaration of Guy Cecil of Priorities USA dated Jan. 24, 2020 ("Cecil Decl.") ¶¶ 4, 11-13.

### A.      The Absentee Ballot Organizing Ban

Absentee voting is more convenient than voting in person at designated polls because it does not require travel to a polling location and can be done over a period of weeks preceding election day. Mich. Comp. Laws § 168.759; Declaration of Dr. Max Palmer dated Jan. 27, 2020 ("Palmer Decl.") ¶¶ 15-17. In other words, it can be done at the convenience of home (or anywhere) at a time that does not conflict

with work, school, or other obligations, and does not require the expense, time, and burden of travel and potentially standing in long lines. Absentee voting is particularly beneficial to students and other younger voters, who are less likely to have access to transportation, as well as workers who may struggle to take time off of work to vote in person on election day. Hunter Decl. ¶¶ 9, 16; Lubin Decl. ¶¶ 14, 18, 20-23; Palmer Decl. ¶¶ 18-19.

Organizations that target those voters rely on organizing around absentee voting. DAPRI encourages voters to vote absentee when they work far away from home and getting to the polls on election day would be prohibitively time consuming. Hunter Decl. ¶ 16. Both DAPRI and Rise have a programmatic focus of encouraging college students to vote absentee. Hunter Decl. ¶ 16; Lubin Decl. ¶¶ 3, 24, 26. Rise encourages absentee voting because convenience is a significant factor in youth voting. Lubin Decl. ¶¶ 22, 24; Palmer Decl. ¶ 19. Between classes, studying, extracurriculars, and a lack of access to private transportation, voting in person on election day is decidedly difficult for college students. Lubin Decl. ¶ 20, 22-23; Palmer Decl. ¶ 19 (study showed 40+ percent of young voters who did not vote in 2016 cited being too busy). DAPRI also encourages college students who are registered to vote at home but attend college in another part of Michigan to vote absentee, for example a student in Detroit who is registered to vote on the Upper Peninsula. Hunter Decl. ¶ 16.

Prior to Proposal 3, only certain Michigan voters could participate in absentee voting (for example, voters who are disabled, voters over sixty, and pretrial detainees). *See* Mich. Comp. Laws § 168.758 (repealed 2018). Proposal 3 expanded absentee voting to all. *See* Mich. Comp. Laws § 168.2(a). Election officials in Michigan widely expect absentee voting numbers to surge in the presidential primary and 2020 general election, the first federal elections in which no-excuse absentee voting will be available to all Michigan voters. Ashley Schafer, *City preps for uptick of absentee voters*, Midland Daily News, Nov. 22, 2019; Jackie Smith, *Clerks prepare to handle spike in absentee voters in March presidential primary election*, Port Huron Times Herald, Dec. 10, 2019. In the wake of Proposal 3, the Absentee Ballot Organizing Ban restricts the ability of organizations like Priorities and Rise to persuade and encourage Michigan voters to apply for absentee ballots and makes it more difficult for voters to apply for absentee ballots.

For voters wishing to vote absentee, the voting process starts with an application. To apply, a Michigan voter must submit a signed application to the clerk of the municipality where the voter resides and is registered. *Id.* § 168.759(3); § 168.759(4). But once signed, only the voter or designated groups of people can handle the application, limited to the following:

- An election official or mail carrier;

- A member of the applicant's household or immediate family;[6] and

- A voter registered in Michigan "requested by the applicant to return the application."[7]

*Id.* This last category is far more restrictive than it might appear at first blush. Any non-household or family member assisting with an absentee ballot application must not only be a Michigan registered voter, but must sign a certification on the application that reads:

> I certify that my name is .................... , my address is .................... , and my date of birth is ............ ; *that I am delivering the absent voter ballot application of .................... at his or her request; that I did not solicit or request to return the application*; that I have not made any markings on the application; that I have not altered the application in any way; that I have not influenced the applicant; and that I am aware that a false statement in this certificate is a violation of Michigan election law.

*Id.* § 168.759(4), (5) (emphasis added). Any false statement on an absentee ballot application, including on the certification, is punishable as a misdemeanor. *Id.* § 168.759(8). An unauthorized person who distributes and returns an application is also guilty of a misdemeanor. *Id.* Despite these criminal penalties, the statute

---

[6] Immediate family is "an individual's father, mother, son, daughter, brother, sister, and spouse and a relative of any degree residing in the same household as that individual." Mich. Comp. Laws § 168.2(l).

[7] The statute references a "registered elector." That term is not defined but appears to be used throughout Michigan Election Laws to signify a Michigan registered voter. *See* Mich. Comp. Laws §§ 168.509r, 168.512; *see also id.* § 168.495.

provides no guidance for what constitutes soliciting or requesting to return an absentee ballot application.

The registration requirement (the requirement that a third party be registered to vote to handle an application) and the solicitation ban (the ban on soliciting or requesting to assist a voter with the application) dramatically impede Plaintiffs' ability to mobilize voters in Michigan and to reach the hundreds of thousands of Michiganders who may wish to vote absentee. For example, DAPRI regularly deploys young people who have aged out of the foster system to organize within their communities and pays them a stipend for doing so. Hunter Decl. ¶ 20. These organizing efforts include encouraging people to make a plan to vote, whether by absentee or in person on election day, and then helping them execute their plan. Hunter Decl. ¶ 5. A criminal prosecution could be devastating for these organizers, who are already in a vulnerable position, and DAPRI is careful not to ask them to engage in any activity that could be interpreted to violate the Organizing Ban (or the Voter Transportation Ban for that matter). Hunter Decl. ¶¶ 21-22. This restriction harms DAPRI's ability to fully effectuate its goals and the voters that DAPRI serves. Hunter Decl. ¶¶ 22-23.

In sum, the law suppresses "interactive communication concerning political change" by organizations like DAPRI, Rise, and Priorities. *Meyer v. Grant*, 486 U.S. 414, 421-22 (1988); Hunter Decl. ¶¶ 18-19, 22; Lubin Decl. ¶¶ 3, 6, 18. It also

prevents individuals—especially students, the elderly, those with limited English proficiency, individuals with disabilities, the poor, and other vulnerable citizens of Michigan—from participating fully in the democratic process. Hunter Decl. ¶ 23; Lubin Decl. ¶¶ 17, 21-24. There is no legitimate, much less compelling, justification for these restrictions, and the law should be enjoined.

### B.    The Voter Transportation Ban

Transportation to and from the polls can be a determinative factor in whether many voters, especially students and hourly workers, make it to the polls. Hunter Decl. ¶¶ 8-9; Lubin Decl. ¶ 23; Palmer Decl. ¶ 19 (study showed that 29 percent of all young voters and 38 percent of young voters of color cited lack of transportation as a factor in why they did not vote). Advocacy organizations like Plaintiffs provide rides to the polls as a central part of their organizing efforts. Hunter Decl. ¶¶ 6–11; Lubin Decl. ¶ 24; Ufot Decl. ¶¶ 3-11. The Voter Transportation Ban, however, significantly limits options for any organization seeking to transport voters in Michigan.

The Voter Transportation Ban provides that "[a] person shall not hire a motor vehicle or other conveyance or cause the same to be done, for conveying voters, other than voters physically unable to walk, to an election." Mich. Comp. Laws § 168.931(1)(f). Anyone found guilty of violating the Voter Transportation Ban commits a misdemeanor, *id.*, and faces the prospect of ninety days of imprisonment

and a $500 fine, *id.* § 750.504. According to Attorney General Nessel, the Voter Transportation Ban allows volunteer drivers to provide free rides to the polls, but Plaintiffs and others cannot spend money to "hire a motor vehicle or other conveyance" to perform the same function. Dkt. 10 at 27–29. While unclear exactly what the statute means, its language appears to prohibit not only paying drivers to perform a service, but even renting a car to convey voters to the polls. And it effectively sets a spending limit of $0 on transporting voters to the polls.

This ban limits voters' election day transportation options and prevents people who need transportation—especially students, the elderly, voters who are disabled, and the poor—from getting to the polls. Palmer Dec. ¶ 17-19; Declaration of Andy Didirosi dated Jan. 28, 2020 ("Didirosi Decl.") ¶¶ 4-11; Danielle Burr, *Update on Uber Drives the Vote,* Uber Newsroom (Oct. 24, 2018), available at https://www.uber.com/newsroom/update-uber-drives-vote/. (On election day 2018, Michigan was the only state in which the rideshare company Uber did not provide free and discounted rides to polling places). Plaintiffs desire to provide, facilitate, or receive financial support for transportation to bring these and other voters to the polls. Hunter Decl. ¶ 14; Lubin Decl. ¶¶ 25, 28. Providing rides to the polls is a key organizing tactic for political and advocacy organizations like Plaintiffs, as it helps to encourage voters to participate in the political process helps communities who are traditionally underrepresented at the polls build their political power. Hunter Decl.

¶¶ 5-6; Lubin Decl. ¶¶ 3, 12, 18; Ufot Decl. ¶¶ 3-11. But the Voter Transportation Bans Plaintiffs and other organizations from doing so and makes Plaintiffs and their employees, agents, and partners criminally liable just for helping Michigan voters participate in the democratic process.

In sum, both the Absentee Ballot Organizing Ban and the Voter Transportation Ban restrict Plaintiffs from fully engaging with the Michigan electorate and helping voters exercise their fundamental right to vote.

## LEGAL STANDARD

In weighing a motion for a preliminary injunction, the court must balance four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *City of Pontiac Retired Employees Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014). The reviewing court considers all four factors "as an integrative whole," *Caspar v. Snyder*, 77 F. Supp. 3d 616, 623 (E.D. Mich. 2015) (*citing Liberty Coins, L.L.C. v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014)), but "where a plaintiff demonstrates a likelihood of success on a claimed constitutional violation, a preliminary injunction is nearly always appropriate," *Caspar*, 77 F. Supp. 3d at 623 (*citing Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)). "As long as there is some likelihood

13

of success on the merits, these factors are to be balanced, rather than tallied." *Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 527 (6th Cir. 2017).

The only difference between the preliminary and permanent injunction standard is that for a permanent injunction, a plaintiff must demonstrate actual success on the merits of their claim instead of a likelihood of success. *Am. Civil Liberties Union of Ky. v. McCreary Cty., Ky.*, 607 F.3d 439, 445 (6th Cir. 2010).

## ARGUMENT

All four factors support the court's issuance of a preliminary injunction against the enforcement of the Absentee Ballot Organizing Ban and the Voter Transportation Ban. And, if the Court consolidates trial on the merits with this motion, then a permanent injunction should be issued given the clarity of the law condemning such restrictions and the incontrovertible impact of the challenged statutes on constitutionally protected political expression and voting rights.

## I.     Plaintiffs' claims are meritorious.

Plaintiffs challenge the Voter Transportation Ban and the Absentee Ballot Organizing Ban on eight distinct theories. Each theory is independently likely to succeed on the merits, but "the Court need not determine likelihood of success on the merits for each theory in order to satisfy this factor for the purposes of preliminary injunction analysis." *White v. Beacon Journal Pub. Co.*, No. 5:09 CV 2193, 2010 WL 1948290, at *8 n.16 (N.D. Ohio May 13, 2010). As long as Plaintiffs

are likely to succeed on the merits of at least one theory, the first element is met and the court may move on to consider the other factors.

### A. The Absentee Ballot Organizing Ban is unconstitutional and preempted by federal law.

Plaintiffs will succeed in proving that (1) the Absentee Ballot Organizing Ban violates the speech and associational rights of organizations seeking to organize voters around absentee voting and the right to associate held by voters; (2) the requirement that only voters registered in Michigan assist with the return of absentee ballot applications unduly burdens the fundamental right to vote protected by the Fourteenth Amendment; (3) the prohibition on non-family or household members soliciting voters to apply for absentee ballots is unconstitutionally vague; and (4) the Absentee Ballot Organizing Ban is preempted by the federal Voting Rights Act.

### 1. The Absentee Ballot Organizing Ban is an unconstitutional infringement of First and Fourteenth Amendment speech and association rights.

Activities aimed at encouraging voters to participate in the political process are constitutionally protected speech and association. *See Buckley v. Am. Const'l Law Found.*, 525 U.S. 182, 186 (1999); *Meyer*, 486 U.S. at 421; *League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 720 (M.D. Tenn. 2019); *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1158 (N. D. Fla. 2012); *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 700 (N.D. Ohio 2006); *Hernandez v. Woodard*, 714 F. Supp. 963, 973 (N.D. Ill. 1989) ("Where groups, formal or

informal, seek to advance their goals through the electoral process, [restrictive] regulations . . . impair their ability effectively to organize and make their voices heard."); *see also Valeo*, 424 U.S. at 15 (Supreme Court precedent has "made clear that the First and Fourteenth Amendments guarantee freedom to associate with others for the common advancement of political beliefs and ideas." (internal quotation marks omitted)); *Button*, 371 U.S. at 437 ("Free trade in ideas means free trade in the opportunity to persuade to action."). Here, Plaintiffs are prohibited from engaging in this constitutionally protected activity in Michigan because of the Absentee Ballot Organizing Ban.

It is routine for political campaigns and for advocacy organizations like Plaintiffs and their partners to educate voters about their options to vote absentee, to encourage voters to take advantage of the conveniences of absentee voting, and to offer assistance and to assist voters in voting absentee. Cecil Decl. ¶ 12; Hunter Decl. ¶¶ 5,16; Lubin Decl. ¶ 11, 14; Ufot Decl. ¶12. Indeed, these activities lie at the very core of effective political organizing and activity. Hunter Decl. ¶¶ 5,16; Lubin Decl. ¶¶ 18, 24; Ufot Decl. ¶ 12. And for good reason: absentee voting is a traditional and effective means to increase voter participation, given that it solves the significant hurdles may people face with in-person voting on election day. Hunter Decl. ¶ 16; Lubin Decl. ¶¶ 21-24; Palmer Decl. ¶¶ 15-19. Moreover, these interactions foster conversations about why voting is important and become platforms for discussions

about the relative merits of candidates and other measures on the ballot. Lubin Decl. ¶ 18. These are activities that Plaintiffs would encourage, support, and engage in during the lead up to the next election if not for the prohibitions currently in effect. Cecil Decl. ¶ 19; Hunter Decl. ¶¶ 17-22; Lubin Decl. ¶¶ 26-28.

Thus, offering to assist voters in applying for absentee ballots, like circulating a petition, "necess[arily] involves . . . the expression of a desire for political change." *Meyer*, 486 U.S. at 421. The choice to vote is, after all, a political act in and of itself. *See Buckley*, 525 U.S. at 195-96. Offering to assist voters with the absentee voting process also involves intimate interactions and discussions with voters. Lubin Decl. ¶ 18. The Organizing Ban "involves the direct regulation of communication and political association, among private parties, advocat[ing] for a particular change." *Hargett*, 400 F. Supp. 3d at 725 (alteration in original) (internal quotation marks omitted). Put differently, the Organizing Ban regulates political expression. *See id.*; *see also Meyer*, 486 U.S. at 421–22 (discussing "the type of interactive communication concerning political change that is appropriately described as 'core political speech'").

Because the Absentee Ballot Organizing Ban regulates political expression, it implicates First Amendment speech and association rights. Regulations that directly govern election-related speech and associational conduct are subject to either strict or exacting scrutiny. *See Hargett*, 400 F. Supp. 3d at 722 ("The Supreme Court,

accordingly, has applied 'exacting scrutiny'—not *Anderson-Burdick*—to cases governing election-related speech rather than 'the mechanics of the electoral process.'"). Strict scrutiny requires that the regulation be narrowly tailored to serve a compelling government interest, while exacting scrutiny requires a substantial relationship between the challenged regulation and a sufficiently important governmental interest. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 366-67 (2010); *John Doe #1 v. Reed*, 561 U.S. 186, 196 (2010). "[T]he strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *John Doe #1*, 561 U.S. at 196.

Neither the registration requirement nor the solicitation ban can withstand either level of scrutiny—or any level of scrutiny at all—because neither bear any relation to a legitimate government interest. Plaintiffs expect the State to assert it has a compelling interest in preventing absentee ballot fraud (that is, individuals who either submit fraudulent ballots or fail to return voters' absentee ballots). But the ban is hardly narrowly tailored to address that interest as it targets the *application process*, not the casting of ballots. And, there are robust laws protecting absentee voting. In particular, the process itself requires that a ballot will only be turned over in person directly to the voter only or mailed to the address at which the voters is registered. Mich. Comp. Laws § 168.761(3), (6). If a voter were to receive an absentee ballot that he or she did not request, the voter could still vote in person at

the polls and their absentee ballot would be cancelled. *Id.* § 168.769. Finally, a list of where and to whom absentee ballots were mailed is made public, so it can be reviewed by voters for accuracy. *Id.* § 168.760.

There are also at least seven criminal laws that address voting fraud, including specifically absentee voting fraud:

1. It is a felony to forge a signature on an absentee ballot application, *id.* § 168.759(8);

2. It is a felony to mark, alter, or switch out the absentee ballot itself, *id.* § 168.932(e);

3. It is a felony to possess an absentee ballot belonging to another, *id.* § 168.932(f);

4. It is a felony to "[s]uggest or in any manner attempt to influence" a voter filling out an absentee ballot, *id.* § 168.932(g), (h).

5. It is a felony to bribe a voter, *id.* § 168.932(a);

6. It is a misdemeanor to promise or receive something of value for deciding whether and for whom to vote, *id.* § 168.931(1)(a), (b); and

7. It is a misdemeanor to, in any other way, violate the Michigan Election Laws, *id.* § 168.931(2).

The application process and these criminal statutes diminish any need for the Organizing Ban that the State may assert. *See Buckley*, 525 U.S. at 204-05 (relying on alternatives also in place to prevent fraud including criminal penalties in striking down a restriction on political expression); *Meyer*, 486 U.S. at 427 (same). Accordingly, neither the registration requirement nor the solicitation ban of the Absentee Ballot Organizing Ban can withstand constitutional scrutiny.

### a.    The Registration Requirement

The requirement that only voters registered in Michigan can assist voters in submitting absentee ballot applications (other than family or household members) is subject to strict scrutiny because it prohibits only certain persons—namely individuals who are not registered to vote in Michigan—from engaging in core political expression. Laws that regulate expression differently based on the identity of the speaker are subject to strict scrutiny. *See Citizens United*, 558 U.S. at 340-41. Regardless, because the registration requirement directly regulates core political expression, *see supra* at I.A.1., it is, at a minimum, subject to exacting scrutiny. *See id.* at 366-67; *Hargett*, 400 F. Supp. 3d at 722. *But see Buckley*, 525 U.S. at 207 (Thomas *J.* concurring) (arguing that strict scrutiny applies even to laws that affect but do not directly regulate core political speech).

As discussed *supra* at I.A.1., the registration requirement is not fairly designed to serve any important government interest. The Supreme Court has already recognized as much in *Buckley*, when it struck down a Colorado law allowing only registered voters to circulate initiative petitions because it was likely to result in "speech diminution." *Id.* at 193-194. There, the record reflected that there were 400,000 voting eligible persons who were not registered to vote. *Id.* at 193. The Supreme Court therefore concluded that "[b]eyond question, Colorado's registration

requirement drastically reduces the number of persons, both volunteer and paid, available to circulate petitions." *Id.* at 193.

The impact is even more dramatic here. There are at least 750,000 persons who are eligible to vote but are not registered to vote residing in Michigan. Palmer Decl. ¶¶ 6-13. And there are, of course, millions of U.S. Citizens who do not reside in Michigan. Some of these persons would participate in Plaintiffs' efforts to encourage and assist voters to vote absentee if not for the registration requirement. This registration requirement should suffer the same fate as the registration requirement struck down in *Buckley*.

### b. The Solicitation Ban

The Absentee Ballot Organizing Ban also proscribes non-family or household members from soliciting or requesting to help a voter to return an absentee ballot application. Mich. Comp. Laws § 168.759(4), (5). This solicitation ban is subject to strict scrutiny review because it operates differently based on the identity of the speaker, *see Citizens United*, 558 U.S. at 340-41, and because it acts as a content-based restriction on speech, *Berger v. City of Seattle*, 569 F.3d 1029, 1051-52 (9th Cir. 2009) (applying strict scrutiny to a law that banned active solicitation of donations because it made a content-based restriction). *See also Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642-43 (1994); *Burson v. Freeman*, 504 U.S. 191, 197 (1992); *Planet Aid v. City of St. Johns, MI*, 782 F.3d 318, 326 (6th Cir. 2015); *Dayton*

*Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1489 (6th Cir. 1995). The solicitation ban is further subject to strict scrutiny review because it proscribes political expression. *Citizens United*, 558 U.S. at 340, 366-67 (distinguishing between regulations that "impose no ceiling" on expression and "do not prevent anyone from speaking" from a ban on political expression and applying strict scrutiny to the latter); *Button*, 371 U.S. at 429, 439. The solicitation ban also directly regulates core political expression, *see supra* at I.A.1., and is, at a minimum, subject to exacting scrutiny. *See Citizens United*, 558 U.S. at 366-67; *Hargett*, 400 F. Supp. 3d at 722.

The solicitation ban cannot survive either strict or exacting scrutiny review for the same reasons that undermine the Absentee Ballot Organizing Ban generally. *See supra* at I.A.1. In *Button*, the Supreme Court struck down a Virginia law that criminalized the NAACP's efforts to "solicit" clients, that is, to inform parents and children of their rights to challenge segregation through litigation and to refer those parents and children to NAACP attorneys to bring litigation. 371 U.S. at 421, 434. The Court was in part concerned with the challenged law's vagueness, *see id.* at 431-38, concerns that are present here, *see infra* at I.B.2. But the Court also struck down the law because it prevented the NAACP from persuading others to action, thereby burdening the NAACP's efforts to bring litigation, the organization's chosen means for affecting change. *Id.* at 429-431, 437. Similarly, Michigan's solicitation ban

burdens Plaintiffs' ability to persuade Michigan voters to vote by a convenient means, thereby burdening their ability to affect change through their chosen method, at the ballot box.

### 2. The solicitation ban is unconstitutionally vague and overbroad.

While there is no permissible application of the solicitation ban because it proscribes political expression, even if there were the solicitation ban's language—which prohibits "solicit[ing] or request[ing] to return" an absentee ballot application, Mich. Comp. Laws § 168.759(4), (5)—is unconstitutionally vague. Any state criminal law that is "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement" violates the Due Process Clause of the Fourteenth Amendment. *See United States v. Johnson*, 135 S. Ct. 2551, 2556 (2015) (applying the Due Process Clause of the Fifth Amendment to strike down a federal criminal law). When a criminal law effects political expression, the "standards of permissible statutory vagueness are strict." *Button*, 371 U.S. at 432; *id.* at 438 ("Precision of regulation must be the touchstone in an area so closely touching our most precious freedom."). "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *Id.* at 433. Criminal statutes that touch on political expression are scrutinized more closely because "[t]he threat of sanctions may deter [the exercise of First Amendment rights] almost as potently as the actual

application of sanctions." *Id.* at 433. The solicitation ban does not pass muster under Due Process Clause void-for-vagueness or First Amendment overbreadth and vagueness analysis.

The Absentee Ballot Organizing Ban does not provide any guidance on what it means to solicit or request to return an absentee ballot application. For example, it is unclear whether an organizer solicits a voter to return an absentee ballot application when that organizer stands on his or her neighbor's front porch; asks for the neighbor's vote on a particular candidate, cause, or issue; encourages the voter to vote absentee; and explains how to submit an application, or distributes the application directly to the voter. Or perhaps most directly: the statute threatens an organizer who encourages other voters to vote absentee and informs them of their right to request help in doing so. This interaction—whereby an organizer provides factually accurate information to a voter about the voter's rights—cannot be constitutionally proscribed and Michigan citizens most assuredly cannot be threatened with criminal prosecution and imprisonment for such a discussion. *See id.* at 434; *cf. United States v. Hylton*, 710 F.2d 1106, 1111 (5th Cir. 1983). But the ban does just that. "There thus inheres in the statute the gravest danger of smothering all discussion" regarding the exercise of voter's right to vote absentee. *Button*, 371 U.S. at 434. This is constitutionally impermissible.

The solicitation ban's vagueness is particularly troublesome given the recent expansion of absentee voting rights to all Michigan voters. The 2020 general election will be the first federal general election where absentee voting is open to everyone. Lubin Decl. ¶ 27. Political campaigns and advocacy organizations, like Plaintiffs, have a significant interest in educating voters about their new rights and increasing voter participation. Cecil Decl. ¶ 13; Hunter Decl. ¶¶ 3-5; Lubin Decl. ¶¶ 27-28. Engaging voters in their constituencies and encouraging those voters to exercise political power through voting is key to Plaintiffs' mission. Cecil Decl. ¶¶ 3, 5, 9; Hunter Decl. ¶¶ 4-5; Lubin Decl. ¶ 3. But no organization is likely to ask persons to risk criminal sanction to educate voters about how to exercise their right to absentee vote. Cecil Decl. ¶ 12; Hunter Decl. ¶ 21; Lubin Decl. ¶ 26. The solicitation ban will chill these important and constitutionally-protected conversations. *Button*, 371 U.S. at 432; *cf. Hargett*, 400 F. Supp. 3d at 720.

### 3. The registration requirement imposes an undue burden on the fundamental right to vote.

The Absentee Ballot Organizing Ban's registration requirement operates as an undue burden on the fundamental right to vote protected by the Fourteenth Amendment. Fourteenth Amendment undue burden claims are analyzed under the *Anderson-Burdick* framework. Under *Anderson-Burdick*, a reviewing court considers "the relative interests of the State and the injured voters," and evaluates

"the extent to which the State's interests necessitated the contested restrictions." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995).

The registration requirement severely burdens the fundamental right to vote by significantly limiting the number of people available to assist voters in submitting their absentee ballot applications. A voter can only ask another registered Michigan voter for help with returning the application, including taking it to the post office, scanning and emailing it, or faxing it, even if the person best positioned to assist is not a registered Michigan voter. This especially imposes a severe burden on voters that need assistance completing and returning absentee ballot applications and whose living situations limit their social circles, such as voters living alone, voters living in assisted living situations, first-year college students, or voters who do not speak fluent English. *See* Hunter Decl. ¶¶ 16, 18; Lubin Decl. ¶ 14. With hundreds of thousands of Michigan residents not being registered to vote, the Organizing Ban greatly reduces the likelihood that isolated individuals can find someone to assist them in applying to absentee vote. And due to transportation and mobility issues experienced by these same individuals, they will experience the absence of this assistance more acutely than others because they are likely to find it difficult to get to polling places on election day in the first place. Lubin Decl. ¶¶ 22-24; Ufot Decl. ¶¶ 7-8.

On the other hand, for reasons described *supra* at I.A.1., the relationship between any government interest in the registration requirement is non-existent. It is difficult to even conjure a legitimate reason the government may have for this requirement. If it is to deter fraud, Plaintiffs are aware of no logic—much less data— that would support the notion that a person who is registered to vote is less likely to commit fraud when assisting someone to submit an absentee ballot application than a person who is not registered. Persons choose to register to vote or not for all sorts of reasons, including as an exercise of their First Amendment rights of "political thought and expression." *Buckley*, 525 U.S. at 195-96. Ultimately, the logic of *Buckley*, while an associational case, applies equally here. 525 U.S. at 193.

### 4.    The Voting Rights Act preempts the Absentee Ballot Organizing Ban.

Even if the Absentee Ballot Organizing Ban were not in conflict with fundamental constitutional principles, it in any event conflicts with and violates Section 208 of the Voting Rights Act, 52 U.S.C. § 10508, and is thus preempted and invalid. *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) ("[S]tate laws that conflict with federal law are without effect.") (citations and quotations marks omitted); *Gade v Nat'l Solid Wastes Mgmt Ass'n*, 505 U.S. 88, 98, 109 (1992) (conflict preemption occurs when (a) it is physically impossible to comply with state and federal law, or (b) "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"). *See infra* at I.B.4.

Section 208 of the Voting Rights Act provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice." Within the context of the Voting Rights Act, the act of voting includes "all action necessary to make a vote effective in any primary, special, or general election." 52 U.S.C. § 10310(c)(1). This includes all stages of applying for an absentee ballot. *OCA-Greater Houston v. Texas*, 867 F.3d 604, 615 (5th Cir. 2017) (Interpreting the VRA and stating that "'[t]o vote,' therefore, plainly contemplates more than the mechanical act of filling out the ballot sheet. It includes steps in the voting process before entering the ballot box, 'registration,' and it includes steps in the voting process after leaving the ballot box, 'having such ballot counted properly.' Indeed, the definition lists 'casting a ballot' as only one example in a non-exhaustive list of actions that qualify as voting.") In its report recommending that this protection be added to the Voting Rights Act, the Senate Judiciary Committee noted that state restrictions that "deny the assistance at some stages of the voting process during which assistance was needed" would violate Section 208. S. Rep. No. 97-417, at 63 (1982).

Congress passed the Voting Rights Act to correct entrenched "racial discrimination in voting" that was "an insidious and pervasive evil." *South Carolina v. Katzenbach*, 383 U.S. 301, 308-09 (1966). In recommending that Section 208 be added to the Voting Rights Act, the Senate Judiciary Committee recognized that

voters who do not speak English and voters with disabilities "run the risk that they will be discriminated against at the polls and that their right to vote in State and Federal elections will not be protected." S. Rep. No. 97-417, at 62 (1982). To limit that risk, those voters "must be permitted to have the assistance of a person *of their own choice*." *Id.* (emphasis added).

Section 208 therefore preempts the Absentee Ballot Organizing Ban because it prohibits voters who need help returning their absentee ballot applications from receiving assistance from the person of their choice. Instead, a voter must choose only registered Michigan voters, family members, or household members, and not any of the hundreds of thousands of other Michigan residents who may be none of these things. And more broadly, an absentee voter may not even be assisted by a third party with their application if that third party has offered to help. The Voting Rights Act accordingly preempts the Organizing Ban. *See OCA-Greater Houston*, 867 F.3d 604 (Section 208 preempted a Texas law restricting who may provide interpretation assistance to English-limited voters); *United States v. Berks Cty., Pennsylvania*, 277 F. Supp. 2d 570, 580 (E.D. Pa. 2003) (county election law restricting who may provide language assistance to Spanish-speaking voters violated Section 208).

In sum, the Absentee Ballot Organizing Ban is conflict preempted because (1) it is physically impossible to comply with the Absentee Ballot Organizing Ban's

limitation of the people who are able to provide assistance and Section 208's fully permissive scope and (2) the Absentee Ballot Organizing Ban stands as an obstacle to the VRA's purpose of providing voters who have disabilities or voters with limited English proficiency with the assistance of whomever they desire.

## B.  The Voter Transportation Ban is unconstitutional and preempted by federal law.

For similar reasons, Plaintiffs will succeed in proving that the Voter Transportation Ban (1) violates the speech and association rights of individuals and organizations that, like Plaintiffs, seek to mobilize voters by providing paid transportation to the poll, (2) constitutes an impermissible ban on political expenditures, (3) is unconstitutionally vague and overbroad, (4) places an undue burden on the fundamental right to vote, and (5) is preempted by federal law.

### 1.  The Voter Transportation Ban is an unconstitutional infringement of First and Fourteenth Amendment speech and association rights.

#### a.  The ban unconstitutionally burdens core political expression

Like the Absentee Ballot Organizing Ban, the Voter Transportation ban burdens get-out-the-vote efforts which constitute core political expression. *See supra* at I.A.1. Organized rides-to-the-polls efforts, which often include hiring a bus or other vehicle to transport voters, as well as drivers to drive them, are a common and critical organizing tactic for political and advocacy organizations who seek to

encourage voters to participate in the political process. Hunter Decl. ¶¶ 5-11; Lubin Decl. ¶ 18; Ufot Decl. ¶¶ 2-11. Often these efforts are part of a core strategy to convince individuals to exercise their fundamental right to vote and build political power. Hunter Decl. ¶¶ 4-6; Lubin Decl. ¶¶ 3, 12, 24; Ufot Decl. ¶ 3.[8] These activities are squarely within the bounds of the First Amendment. *see Meyer*, 486 U.S. at 421–22 ("Thus, the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as 'core political speech.'"). Because the Voter Transportation Ban regulates core political expression and specifically because it functions as a ban on political expenditures, it is subject to, at a minimum, exacting scrutiny. *See Citizens United*, 558 U.S. at 366–67; *Meyer*, 486 U.S. at 420; *Valeo*, 424 U.S. at 25, 44-45; *Hargett*, 400 F. Supp. 3d at 722.

There is no question that the Voter Transportation Ban burdens political expression. Because options available to organizers of rides to the polls are limited in Michigan by the ban, the number of voters with whom these organizers can transport is necessarily diminished; the opportunities for political engagement and

---

[8] Many courts have recognized the importance of rides-to-the-polls or souls-to-the-polls, especially in minority communities. *Fair Fight Action, Inc. v. Raffensperger*, 2019 WL 6836774, at *3 (N.D. Ga. May 30, 2019); *N.C. State Conference of NAACP v. McCrory*, 182 F. Supp. 3d 320, 392 & n. 90 (M.D.N.C. 2016), *rev'd on other grounds*, 831 F.3d 204 (4th Cir. 2016); *Florida v. United States*, 885 F. Supp. 2d 299, 372 (D.D.C. 2012); *One Wisc. Institute, Inc. v. Thomsen*, 198 F. Supp. 3d 896, 924 (W.D. Wisc. 2016).

interaction is therefore also diminished. Hunter Decl. ¶¶ 13-15; Ufot Decl. ¶¶ 5-6, 9-11. The Supreme Court has consistently held that diminished opportunities for political expression are unconstitutional. In *Meyer*, the Supreme Court struck down a law that made it a felony to pay circulators of initiative petitions. 486 U.S. at 416. In *Buckley*, the Supreme Court struck down a law that only allowed registered voters to circulate initiative petitions. 525 U.S. at 193. In both cases, the Supreme Court reasoned that the challenged laws would diminish political expression by lessening the pool of people available to assist the proponents of initiative petitions. *Buckley*, 525 U.S. at 194; *Meyer*, 486 U.S. at 423. The reasoning applies equally here.

Moreover, the Voter Transportation Ban cannot survive exacting scrutiny review because it does not promote any legitimate, much less compelling, government interest. Indeed, it is not at all clear what government interest is served by the ban. How were Michigan elections served by Michigan's voters' exclusion from Uber's nationwide rides-to-the-polls promotion? To the extent the State might argue that Voter Transportation Ban serves as a prophylactic against vote buying, vote buying is already expressly criminalized under Michigan law. Mich. Comp. Laws §§ 168.931(b)(i), 168.932(a).

### b.   The ban unconstitutionally restricts political expenditures

By criminalizing the act of paying to transport voters to the polls, the Voter Transportation Ban imposes an unconstitutional $0 spending limitation on the act of

transporting voters to the polls. The act of transporting voters to the polls is a recognized element of voter registration and get-out-the-vote drives. *E.g.*, 11 C.F.R. § 114.4(d)(1) ("Voter registration and get-out-the-vote drives include providing transportation to the polls or to the place of registration."). And as now-Justice Kavanaugh noted in *Emily's List v. Fed. Election Comm'n*, people "are entitled to spend and raise unlimited money for those activities." 581 F.3d 1, 16 (D.C. Cir. 2009) (referring to "advertisements, get-out-the-vote efforts, and voter registration drives"). Because it is an element of get-out-the-vote efforts, the act of spending money to transport voters to the polls is political speech protected by the First Amendment. *See id.*; *see also Valeo*, 424 U.S. at 23 (noting that "expenditure ceilings impose . . . severe restrictions on protected freedoms of political expression and association"). A long line of Supreme Court precedent holds that any regulation of political spending must be "closely drawn to serve a cognizable anticorruption interest." *Emily's List*, 581 F.3d at 18 (citing *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 735 (2008); *Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 478-80 (2007); *Fed. Election Comm'n v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 496-97 (1985); *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley, Cal.*, 454 U.S. 290, 296-97 (1981); *Valeo*, 424 U.S. at 26-27.

No such anticorruption justification exists for the Voter Transportation Ban, and even if one did exist, the law is not closely drawn to address it. The Voter Transportation Ban does not prohibit a person from transporting voters to the polls; it simply imposes an expenditure ceiling of $0 that a person may spend to transport voters to the polls. If the Voter Transportation Ban contains any anticorruption element, it is not apparent on its face or in its reach. Under the Defendant's interpretation of the law, a private bus or car company would be able to freely exercise its First Amendment right to engage in get-out-the-vote efforts by directing its drivers to use its vehicles to transport thousands of Michigan voters to the polls, but an organization such as Plaintiffs Priorities or Rise would be unable to hire that same private bus or car company to perform the exact same service. *See* Dkt. 10 at 27 (stating that a company could use its own employees or solicit volunteers to transport voters to the polls, but could not hire a driver to do the same). This is nonsensical. There is no evidence to suggest that paying drivers, renting cars, or otherwise paying money to convey voters to the polls would contribute to corruption any more or less than using employee or volunteer drivers. *Cf. Meyer*, 486 U.S. at 426 (refusing to accept the unsupported allegation that paid petition circulators are any more likely to engage in corrupt behavior than a volunteer who is motivated entirely by an interest in the outcome). Again, to the extent the State professes interest in preventing *quid pro quo* arrangements, Dkt. 10 at 29, Michigan law

already makes it a misdemeanor to "receive, agree, or contract for valuable consideration" for "[v]oting or agreeing to vote, or inducing or attempting to induce another to vote, at an election." Mich. Comp. Law § 168.931(b)(i)

### 2. The Voter Transportation Ban is unconstitutionally vague and overbroad.

Although there is no permissible application of the Voter Transportation Ban because it proscribes political expression and sets an unconstitutional limit on political expenditure, even if there were, the Transportation Ban is unconstitutionally vague and overbroad under both Fourteenth Amendment due process and First Amendment principles. *See supra* at I.A.2. (describing legal standard). The Voter Transportation Ban criminalizes the act of "hir[ing] a motor vehicle" to transport voters to the polls unless those voters are "physically unable to walk." Mich. Comp. Law. § 168.931(f). It provides no further guidance on what it means to hire a motor vehicle, and ordinary people can differ in their interpretation of this restriction. For example, it is unclear whether the law prohibits a voter from hiring a taxi or an Uber to the polls while allowing a neighbor to ride along for free, or whether an organization that rents a vehicle for election day but uses volunteer drivers violates the law. And it is unclear whether all compensation paid to drivers, whether a wage, stipend or gas money, constitutes hiring a vehicle for the purposes of the Voter Transportation Ban.

Similarly, the Voter Transportation Ban does not define what it means to be "physically unable to walk." The provision's plain language suggests that only those voters who cannot walk may be transported to the polls via hired motor vehicles. But Defendant's prior representations to the Court regarding this statute suggests that these words actually create a broad exception that applies not only to voters who cannot walk, but also to those who are blind, have epilepsy, or some other motor control ailment. *See* Dkt. No. 10 at 31. But the statute itself does not provide this guidance to those who seek to transport such voters to the poll or, even more importantly, those prosecuting attorneys tasked with enforcing Michigan's election laws.

The Transportation Ban is therefore unconstitutionally vague and overbroad.

### 3.   The Voter Transportation Ban places an undue burden on the fundamental right to vote.

The Voter Transportation Ban also constitutes an undue burden on the fundamental right to vote protected by the Fourteenth Amendment to the U.S. Constitution. As discussed above, *supra* I.A.3., a reviewing court faced with an undue burden claim must balance "the relative interests of the State and the injured voters," and evaluate "the extent to which the State's interests necessitated the contested restrictions." *McIntyre*, 514 U.S. at 345. The more severe the burden on First and Fourteenth Amendment rights created by a regulation, the more severe the scrutiny applied to the regulation. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

The Voter Transportation Ban constitutes a severe burden on the right to vote of Michigan citizens who lack access to private transportation, such as the student voters served by Rise or the workers served by DAPRI. A significant percentage of otherwise eligible youth voters who did not vote cited transportation issues as a contributing reason. Palmer Decl. ¶ 19. By criminalizing an additional transportation option that would reduce the transportation time and cost for these voters, as well as many voters, the Voter Transportation Ban makes it substantially more difficult to exercise the right to vote.[9] Didirosi Decl. ¶¶ 4-1l; Hunter Decl. ¶¶ 8-10; Lubin Decl. ¶¶ 20-25; Palmer Decl. ¶¶ 17-19; Ufot Decl. ¶ 7-8.

The Voter Transportation Ban is not fairly aimed at service to any legitimate government interest. *See supra* at I.B.1. And even if the Court were to find that the Voter Transportation Ban burdens the right to vote only slightly, there is no legitimate governmental interest that makes the challenged statute *necessary*.

---

[9] Plaintiffs ask the Court to take judicial notice that the Voter Transportation Ban necessarily reduces election day transportation options for individuals who lack access to personal motor vehicles or reliable, convenient public transportation because this fact "is not subject to reasonable dispute." Fed. R. Evid. 201(b); *cf. Meyer v. Grant*, 486 U.S. 414, 422–23 (1988) (eliminating paid petition circulators limited the number of circulators and reduced the number of voices conveying the message); *Chandler v. City of Arvada, Colorado*, 292 F.3d 1236, 1243 (10th Cir. 2002) (limiting circulators to residents decreased the pool of circulators). To further quantify this burden, Plaintiffs have filed concurrently with this motion a motion for limited expedited discovery related to polling locations, the Michigan voter file, and vehicle ownership.

Because Defendant cannot satisfy the *Anderson-Burdick* test for severe or slight burden, the Voter Transportation Ban unconstitutionally burdens the right to vote.

### 4.    Federal law preempts the Voter Transportation Ban.

Finally, and in any event, the Voter Transportation Ban's spending limitation of $0 applies to elections involving federal candidates and stands in stark contrast with federal regulations that *expressly permit* corporations to spend money to transport voters to polls. 11 C.F.R. § 114.3(c)(4)(i); 11 C.F.R. § 114.4(d)(1). The Voter Transportation Ban is therefore both expressly and impliedly preempted by the Federal Election Campaign Act ("FECA") and its regulations.

### a.    The FECA's preemption provision and its accompanying regulation expressly preempt the Voter Transportation Ban.

"Express preemption exists where either a federal statute or regulation contains explicit language indicating that a specific type of state law is preempted." *State Farm Bank v. Reardon*, 539 F.3d 336, 341-42 (6th Cir. 2008). The FECA, which provides a uniform national regulation of political spending in federal elections, contains an express preemption provision that states, in relevant part, that "the provisions of this Act, and of rules prescribed under this Act, supersede and preempt any provision of State law with respect to election to Federal office." 52 U.S.C. § 30143. The scope of preemption was further defined by the Federal

Elections Commission in 11 C.F.R. § 108.7. Section 108.7 incorporates FECA's

preemption statute and provides:

> (b) Federal law supersedes State law concerning the—
>
>> (1) Organization and registration of political committees supporting Federal candidates;
>>
>> (2) Disclosure of receipts and expenditures by Federal candidates and political committees; and
>>
>> *(3) Limitation on contributions and expenditures regarding Federal candidates and political committees.*
>
> (c) The Act does not supersede State laws which provide for the—
>
>> (1) Manner of qualifying as a candidate or political party organization;
>>
>> (2) Dates and places of elections;
>>
>> (3) Voter registration;
>>
>> (4) Prohibition of false registration, voting fraud, theft of ballots, and similar offenses;
>>
>> (5) Candidate's personal financial disclosure; or
>>
>> (6) Application of State law to the funds used for the purchase or construction of a State or local party office building to the extent described in 11 CFR 300.35.

(Emphasis added.) "[B]ecause [§ 108.7] was tacitly approved by Congress, [it]

represents a valid interpretation of congressional intent" regarding FECA's

preemptive scope. *Weber v. Heaney*, 793 F. Supp. 1438, 1452 (D. Minn. 1992), *aff'd*,

995 F.2d 872 (8th Cir. 1993).

In sum, the FECA expressly supersedes state law regarding limitations on contributions and expenditures in federal elections. 52 U.S.C. § 30143; 11 C.F.R. § 108.7; *see also Weber*, 793 F. Supp. at 1452 (finding that § 108.7 is "probably the most persuasive evidence that [FECA's preemption provision] was intended to preempt all state laws purporting to regulate congressional campaign expenditures"). The Voter Transportation Ban, by its plain language and intended reach, functions as a limitation on expenditures by criminalizing disbursements for providing transportation to the polls for all elections including federal elections. Because the Voter Transportation Ban attempts to regulate permissible expenditures in federal elections, it is expressly preempted.

### b.   The Voter Transportation Ban is impliedly preempted.

Even if this Court were somehow to hold that the FECA does not expressly preempt the Voter Transportation Ban, it is still impliedly preempted through conflict preemption by the regulations that permit corporations to spend money to transport voters to the polls. Courts determine whether conflict preemption exists on a case-by-case basis, looking at the entire federal statutory scheme to determine whether the challenged state law serves as "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). "A state law also is pre-empted if it interferes with the methods

by which the federal statute was designed to reach this goal." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987).

Here, two federal regulations promulgated pursuant to the FECA expressly permit disbursements—that is, the spending of money— to provide transportation to the polls for voters. 11 C.F.R. § 114.3(c)(4)(i) (permitting corporations to make disbursements to provide transportation to the polls for certain employees and establishing the scope of permissible express advocacy); *id*. § 114.4(d)(1) (permitting corporations to make disbursements to provide transportation to the polls for the general public and employees outside the restricted class covered by 11 C.F.R. § 114.3). Although the text of these regulations permits corporations to "provide" transportation, it does so in the context of making "disbursements," that is, spending money, to provide these services.

These federal regulations further FECA's purpose of "insur[ing] the integrity of the election process by regulating the critical aspects of campaigning and campaign funding, and by opening up the whole area to informed scrutiny by the electorate." *Gifford v. Congress*, 452 F. Supp. 802, 805 (E.D. Cal. 1978). These regulations are a part of the system Congress and the FEC created to establish rules regarding permissible monetary disbursements and the reporting of such disbursements. And even though "even though federal law merely permit[s] but d[oes] not compel" payment for the transportation of voters to the polls, *Ass'n of*

*Banks in Ins., Inc. v. Duryee*, 270 F.3d 397, 404 (6th Cir. 2001), this law preempts the Voter Transportation Ban because it stands as an obstacle to the full accomplishment of federal objectives. *See, e.g.*, *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373–74 (2000) (state law restricting ability to conduct trade with Burma conflict preempted because it posed an obstacle to federal statute imposing sanctions on Burma); *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 881 (2000) (state law requiring certain in-car safety restraints conflict preempted because it posed an obstacle to federal objective of giving car manufacturers an option of using a "variety and mix" of restraints); *Felder v. Casey*, 487 U.S. 131, 153 (1988) (state law imposing certain requirements on plaintiffs seeking relief against state officials conflicted with Section 1983's objective and was preempted).

The evenhanded application and equalized availability of these rules to all federal elections across the country not only provide for transparency and integrity, but also promote the appearance of fairness in both intra- and interstate federal elections (that is, federal legislative elections and the presidential election). If Michigan's Voter Transportation Ban is allowed to stand, Plaintiffs and any other person will not be able to pay to provide transportation for voters to the polls on election day 2020. But it will be perfectly legal for Plaintiffs and any other person

to engage in that act in the neighboring states of Wisconsin, Indiana, and Ohio, as well as every other state.

## II.   Plaintiffs will suffer irreparable harm without a preliminary injunction.

Absent an injunction Plaintiffs, other organizations and individuals wishing to help Michigan voters participate in the democratic process, and Michigan voters themselves will be irreparably injured. Irreparable injury is presumed "when constitutional rights are threatened or impaired." *Obama for Am.*, 697 F.3d at 436. In particular, a "restriction on the fundamental right to vote," *id.*, or the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, (1976). Similarly, a plaintiff's harm from a denial of a preliminary injunction is irreparable if monetary damages are so difficult to calculate that the injury "is not fully compensable by monetary damages," as it is here. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007).

Plaintiffs have expressed a desire and intent to pay for transportation to the polls in the upcoming elections consistent with their First and Fourteenth Amendment rights, Cecil Decl. ¶ 11; Hunter Decl. ¶ 15; Lubin Decl. ¶¶ 18, 25, but the Voter Transportation Ban's spending limitation stands in its way. Similarly, Plaintiffs have expressed an intent to carry out organizing activities that are criminalized by the Organizing Ban. Cecil Decl. ¶ 12; Hunter Decl. ¶¶ 17-19; Lubin

Decl. ¶¶ 18, 26. If a preliminary injunction does not issue, Plaintiffs' ability to engage in constitutionally protected expression and participate in—and assist others in fully participating in—the democratic process will be irreparably harmed.

And the clock is ticking. The 2020 general election which will include highly competitive races for President, U.S. Senate, and the U.S. House of Representatives. Fundraising has already begun. Additional fundraising and volunteer recruitment efforts take time, coordination, and money, and each day lost negatively impacts these efforts. Lubin Decl. ¶ 29. Because each election is a unique, non-repeatable occurrence, no amount of monetary damages can make Plaintiffs whole if these voting restrictions are in place for the upcoming primary and general elections. "[O]nce the election occurs, there can be no do-over and no redress." *League of Women Voters of N.C.,* 769 F.3d at 247. Plaintiffs and others will be irreparably harmed absent an injunction.

## III.   A preliminary injunction will not cause substantial harm to others.

Moreover, neither Defendant nor anyone else will suffer any harm if the Absentee Ballot Organizing Ban and Voter Transportation Ban is enjoined. Defendant will not experience any harm for the same reason that the State has no legitimate reason for the laws in the first place—neither deter fraud, and, to the extent fraud is a concern, a litany of other statutes already address the issue. *See supra* at I.A.1., I.B.1. Defendant will experience only *de minimis* inconvenience

44

because the requested relief does not require her to take any action beyond communicating that she will not enforce the Bans. Finally, because Plaintiffs have demonstrated a substantial likelihood of success on the merits of its constitutional challenges, "no substantial harm to others can be said to inhere" in the enjoinment of the challenged Bans. *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty., Tennessee*, 274 F.3d 377, 400 (6th Cir. 2001).

**IV.    A preliminary injunction is in the public interest.**

Generally, "the public interest is served by preventing the violation of constitutional rights." *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004). This is particularly true where the constitutional rights involve the integrity of the electoral franchise. As the Fourth Circuit has recognized, federal courts have a "significant duty . . . to preserve constitutional rights in the electoral process." *Hutchinson v. Miller*, 797 F.2d 1279, 1283 (4th Cir. 1986). And as the Sixth Circuit has noted, "[t]here is a strong public interest in allowing every registered voter to vote freely." *Summit Cty. Democratic Cent. & Exec. Comm. v. Blackwell*, 388 F.3d 547, 551 (6th Cir. 2004). In this case, a preliminary injunction would protect not only Plaintiffs' own constitutional rights related to the electoral process, but also ensure that more Michigan citizens, including those citizens who have traditionally been excluded from the electorate or faced difficulties registering and casting a ballot, can participate freely in the

electoral process. But this is true only if the laws are enjoined in time to allow organizations like Priorities, Rise, and DAPRI to prepare for the next election day.

## CONCLUSION

Plaintiffs' respectfully submit that the Court should grant Plaintiffs' motion for a preliminary and permanent injunction to prevent the violation of Plaintiffs' constitutional rights and ensure that voters have every opportunity to fully engage in the democratic process and exercise their fundamental right to vote. Plaintiffs request that the Court enjoin the State from enforcing the Voter Transportation Ban and the Absentee Ballot Organizing Ban.

Dated: January 28, 2020

Kevin J. Hamilton
PERKINS COIE LLP
1201 3rd Ave.
Seattle, WA 98101
Telephone: (206) 359-8000
Facsimile: (206) 359-9741
khamilton@perkinscoie.com

Sarah S. Prescott, Bar No. 70510
SALVATORE PRESCOTT &
PORTER, PLLC
105 E. Main Street
Northville, MI 48168

*Attorneys for Plaintiffs*

Respectfully submitted,

By:   /s/ Marc E. Elias
Marc E. Elias
Christopher J. Bryant
Courtney A. Elgart*
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
melias@perkinscoie.com
cbryant@perkinscoie.com
celgart@perkinscoie.com

*Attorneys for Plaintiffs*
*Seeking Admission to E.D. Mich.

## CERTIFICATE OF SERVICE

I hereby certify that on January 28, 2020, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, and will serve the motion on Defendant with the Complaint.

## LOCAL RULE CERTIFICATION

I, Marc Elias, certify that this document and complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that I have filed a motion seeking an extension on the word limit contained in Local Rule 7.1(d)(3) for good cause.

Respectfully submitted,

By:   /s/ Marc E. Elias
Marc E. Elias
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
melias@perkinscoie.com

47